MARY A. SCHLEY, APPELLANT, V. MICHAEL HORAN ET AL., APPELLEES.

FILED NOVEMBER 19, 1908. No. 15,376.

1. **Deeds: MENTAL CAPACITY: EVIDENCE.** Where it appears that a son, for nine years prior to his majority, worked in iron mills, and turned his entire earnings over to his parents, and after reaching his majority faithfully worked for and upon the farm of his parents for a period of more than 20 years without other compensation than his support, and a few years prior to her death the mother, who is then the sole surviving parent, of her own volition deeds her entire estate, consisting of a farm of 120 acres, to such son for an express consideration of love and affection and $1, and it is sought by a sister of such son, who during substantially all of said years had been a married woman living with her husband separate and apart from her parents, to set aside said deed on the ground of want of mental capacity on the part of the mother to make the same, such want of mental capacity must be established by clear and satisfactory evidence. The fact that the mother at the time of executing said deed was

over 80 years of age, and the further fact that during the later years of her life she manifested some hallucinations of mind, are not alone sufficient to warrant the setting aside of such conveyance. In such a case it must be clearly established that the mind of the mother was so weak or unbalanced at the time of executing the deed that she could not understand and comprehend the purport and effect of what she was then doing.

2. ———: UNDUE INFLUENCE: EVIDENCE. Evidence examined and set out in the opinion *held* insufficient to show any fraud or undue influence on the part of the defendant in obtaining the deed to the property in controversy.

3. ———: SETTING ASIDE: EVIDENCE. Evidence examined and set out in the opinion *held* sufficient to sustain the finding and decree of the district court.

APPEAL from the district court for Colfax county: CONRAD HOLLENBECK, JUDGE. *Affirmed.*

*William M. Cain,* for appellant.

*J. J. Sullivan* and *C. J. Phelps, contra.*

FAWCETT, C.

Plaintiff alleges that she and the defendant Michael Horan are the only children and heirs at law of Catherine Horan, deceased; that Catherine died intestate in March, 1904; that at the time of her death she was the owner of the property in controversy, consisting of 120 acres of land in Colfax county; that for a number of years prior to June 10, 1901, defendant Michael had lived with the mother upon the lands in controversy, during which time the said Catherine was aged, sickly, and weak and infirm in both mind and body; that the business was transacted by Michael, to whom the mother looked and upon whose suggestions, advice and judgment she relied and depended in all matters of a business or property nature; that the mother herself, by reason of her extreme age and physical and mental infirmities, was incapable of attending to her more important business affairs; that, on account of their long residence together and her habit of relying upon

48

Michael, an "extraordinary," confidential relation existed between them, and the mind of the mother was subject to and under the dominion of the son; that on said last mentioned date the son, taking advantage of the influence and dominion which he had acquired over the mind of his mother, by employing false and fraudulent promises and representations that he would comfortably support and provide for her a home on said lands in her declining years, induced and persuaded the mother to sign and deliver to him a warranty deed of said lands; that the only consideration for said deed was the said promise of comfortable support and a home; that Michael never intended to keep said promise and had not kept it; that, since the death of the mother, Michael had taken and received the rents, issues and profits of the lands under his claim of ownership, and prays that the deed be declared null and void, that the lands be partitioned, and one-half thereof be set off to plaintiff, and for an accounting of the rents and profits. Defendant admits that he and plaintiff are the only children of Catherine Horan, admits that on the 10th day of June, 1901, the legal title to the real estate in controversy was conveyed to him by their mother, denies all of the allegations of dominion over his mother or of bad faith or undue influence exercised over her, alleges that on the said 10th day of June, defendant and his wife were living at South Omaha, Nebraska, and had been continuously living there for some three or four months prior thereto; that when the father of plaintiff and defendant purchased the lands in controversy, about 1877, defendant was then a young man 21 years of age; that prior to that time, while living in the state of New Jersey, he had worked in the iron mills, and had given his entire earnings to his parents; that these earnings went into the family fund and were used in the purchase of the lands in controversy; that, after the land had been purchased, he continuously resided with his parents until his marriage in 1896 or 1897; that for a period of four years thereafter he and his wife continued

to live upon the farm with their parents; that during all of that time he worked for his parents upon the farm without other compensation than his support; that during the four years he and his wife lived upon the farm his wife also worked without other compensation than her support; that during the years he was living with his parents and working for them they repeatedly promised and assured him that when they died the farm should be his; that the execution of the deed to him by his mother on June 10, 1901, was in compliance with said promises, and denies each and every other allegation in plaintiff's amended petition. The reply was a general denial. There was a trial to the court and a decree in favor of defendants, from which plaintiff appeals. No motion for new trial was made in the court below, nor any assignment of errors filed in this court, so that the case stands for trial *de novo* in this court upon the record as made.

Plaintiff testified that her recollection goes back for 51 years, so that she must now be somewhere between 55 and 60 years of age. The defendant Michael is two years younger. Plaintiff seems to have been a widow at the time the family moved to Nebraska in 1876 or 1877. After coming to Nebraska she worked out for herself most of the time until her remarriage. While she made the home of her parents her home, she did not actually reside upon the farm and assist her parents to exceed one year all told. She was subsequently married to Fred Schley, and at the time of the trial, and for a number of years prior thereto, had been living with her husband upon a farm quite near to the lands in controversy. The undisputed evidence shows that defendant Michael had lived upon the farm with the parents and worked faithfully for them from the time they purchased the farm in 1877 until his marriage in 1896 or 1897, a period of 20 years, and, together with his wife, continued to work for his parents for 4 years thereafter. It is quite evident, therefore, that he had contributed in a large degree to the improvement and preservation of the property in controversy, while

plaintiff had contributed practically nothing thereto. The father died in 1898. Michael and his wife continued to live with the mother until January, 1901. It seems that the mother-in-law and daughter-in-law did not get along any too well together, so Michael removed to South Omaha and went to work in one of the packing houses. Thereafter the mother lived alone upon the farm. As might reasonably be expected, her life during that time seems to have been very lonely. On June 3, 1901, she wrote to Michael, at South Omaha, the following letter: "Dublin, June 3, 1901. My dear Son: I am sick and almost dying and I want you to come home and live in the house. I want to see you and I will make the place entirely over to you. If you do not come I will sell it for I cannot live here alone. You will not want for anything while I live. Bring Polly and come home and I will never put you out again. If you will come I will go up to town and make the place over to you as soon as you come. Your loving mother, Kittie Horan." Within a few days after the receipt of this letter, Michael went to Schuyler and called upon Mr. C. J. Phelps, a prominent lawyer and old-time citizen of Schuyler, to whom he showed the letter. He then went out to the farm and spent the night with his mother. On the next day they went to Schuyler and called at the office of Mr. Phelps, where the matter was all talked over between Mr. Phelps, Mrs. Horan, and Michael, and a couple of old-time friends of the parties. Mr. Phelps testified that he read her the letter which Michael had received; that he also told the old lady that Michael had informed him that she and her husband had promised Michael that when they died the farm should be his, and that Mrs. Horan said that was true; that after matters were all talked over he prepared the deed from Mrs. Horan to Michael; that after the deed had been executed and delivered to Michael he drew up the following agreement, which was signed by Michael and given to his mother, viz.: "Know all men by these presents: That I Michael Horan, of Colfax county, Nebraska, for and in

consideration of my mother, Catherine Horan, deeding to me in fee simple her farm in Colfax county, Nebraska, described as follows: The southwest one-fourth of the northeast quarter, and the south half of the northwest quarter of section thirty-three, in township nineteen, range four, east of the sixth principal meridian, in Colfax county, Nebraska, I hereby agree to comfortably support my said mother, and give her a home in the house with me on said land. Witness my hand this 10th day of June, 1901. Michael Horan. In the presence of Chris Kroeger, C. J. Phelps."

At this time the land in controversy was being worked by plaintiff's husband under a one year lease; and the testimony of Michael is that he was advised that his brother-in-law would not consent for him to live upon the premises during the period of this lease. Michael did, however, go out and stay with his mother at that time for three days, when he returned to South Omaha, where he continued to live until the following fall. During that period of time, however, he made several visits to his mother, remaining with her at one time for about a month. In the fall of 1901 Michael and his wife removed from South Omaha to Schuyler. Michael did not undertake to reside with his mother on the farm until March 1, 1902, on the expiration of the brother-in-law's lease. While, on account of the disagreements between his mother and wife, Michael did not take his wife out to the farm, the evidence shows that he spent most of his time on the farm with the mother from March 1, 1902, until the time she went to the hospital, shortly before her death. During that time he spent every night except three with his mother upon the farm. After the mother's death his wife joined him on the farm, and they have been in possession of it ever since. The mother was a member of the Catholic church, and some three or four months prior to her death Michael, at her request, took her to a Catholic hospital in Columbus, where she remained until she died, Michael paying the hospital charges and doctors' bills. There is

an entire absence of any testimony in the record even tending to show that Michael did anything to induce his mother to write the letter of June 3, or to induce her to deed the lands to him. Michael's testimony that his father and mother had assured him that when they died the land should be his is corroborated by his wife, who testified that shortly before the father's death he made the same assurance to Michael in her presence, and also by the testimony of Mr. Phelps that, when he told Mrs. Horan what Michael had claimed in that regard, she said that was true. It would seem, therefore, that, aside from the desire of the mother to have Michael come and look after her in her declining years, which, together with his agreement for her support, would have been a good consideration, the deed was really executed in consummation of the oral promises which previously had been made both by herself and her husband. Conceding that, the property in controversy being the homestead, this oral agreement could not have been enforced, it cannot be doubted that a subsequent voluntary consummation of the oral agreement by Mrs. Horan would be valid.

The only evidence offered by plaintiff to in any manner impeach the deed is the evidence of plaintiff and her husband and two or three neighbors to the effect that for several years prior to her decease Mrs. Horan had been somewhat infirm in health, and during the time she was living alone had been the victim of some hallucinations. They testified that she claimed that boys were troubling her at nights, throwing stones and other missiles at her house, when such was not the fact; that on two or three occasions she claimed to have seen spooks running up and down the wall; and that she claimed to have seen two or three persons who at the time were dead. As to this latter claim, the evidence is somewhat uncertain as to whether she claimed to have actually seen these persons, or whether they had appeared to her in her sleep; but, be that as it may, the testimony of the neighbors does not go to the extent of showing that during any of these times Mrs. Horan

was so mentally unbalanced that she was not able to transact her business. As against that there is the testimony of Mr. Phelps, who had known Mrs. Horan for many years, Mr. Mick, a merchant in Schuyler with whom she had traded for many years, and who talked with her on the day she executed the deed, and Mr. Chaplan, who had known her from the time she came to Nebraska in 1877, who all three testified that in June, 1901, at the time she executed the deed, she was mentally all right and able to transact her businsess as she had previously done. The uncontradicted evidence also shows that Mrs. Horan handled the moneys of the family even during the lifetime of her husband, and during all of her life transacted the bulk of the business, so far as the payment of moneys was concerned. Without pursuing the matter further, an examination of the record has satisfied us that at the time she executed the deed to Michael she possessed ample mental capacity to execute it; that in making the deed she did exactly what she and her husband had agreed to do, and what in equity and good conscience she ought to have done; that the deed was executed voluntarily on her part, and without any undue influence on the part of Michael. We do not see how the district court could have reached any other conclusion than the one which it did reach in this case.

We therefore recommend that the judgment of the district court be affirmed.

CALKINS and ROOT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.