IN RE GUARDIANSHIP OF ANNA MARGARET WESSEL.
CLARA EHLERS ET AL., APPELLEES, V. ANNA MARGARET
WESSEL, APPELLANT.
CLARA EHLERS ET AL., APPELLEES, V. CHARLES H. WESSEL,
APPELLANT.

FILED JUNE 25, 1926. NOS. 23813, 23814.

1. **Deeds:** CANCELATION: MENTAL CAPACITY: BURDEN OF PROOF. "Where it is sought to cancel a deed for the want of mental capacity of the grantor to make the instrument, the burden of proof is on the one who alleges the mental incapacity." *Brugman v. Brugman,* 93 Neb. 408.

2. ——: EXECUTION: MENTAL CAPACITY. "In determining the mental capacity of the grantor to execute a deed, if it clearly appears that when the instrument was executed the grantor had the capacity to understand what he was doing, knew the nature and extent of his property, and what he proposed to do with it, and to decide intelligently whether or not he desired to make the conveyance, it cannot be said that he was incompetent or incapable of executing the instrument." *Brugman v. Brugman,* 93 Neb. 408.

3. ——: CANCELATION: UNDUE INFLUENCE: BURDEN OF PROOF. Upon conveyance of real estate by a father to his son, when the facts and circumstances surrounding the transaction are such as to show that the deed was executed and delivered for a sufficient consideration, the burden of proof rests on the one who attacks the conveyance to establish the fact of undue influence. The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor.

4. ——: ——: ——: REVERSAL. The record examined, discussed in the opinion, and *held* that the judgment is not supported by the evidence and must therefore be, and it hereby is, reversed, with directions.

APPEAL from the district court for Sarpy county: JAMES T. BEGLEY, JUDGE. *Reversed, with directions.*

*William R. Patrick* and *Lee, Bremers & Bremers,* for appellants.

*Jefferis & Tunison, contra.*

Heard before MORRISSEY, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

Heinrich Wessel and Margaret Wessel, husband and wife, were born in Germany. They were married in Germany and their six children were born there. One died in infancy. Following are the names of the surviving children: Mrs. Elizabeth Koch, Mrs. Adelia Harder, Mrs. Clara Ehlers, Mrs. Emma Warnstedt, and Charles H. Wessel, defendant, who is 38 and unmarried. Plaintiffs' ages seem to range from 34 to 55 years. The four daughters have all joined as plaintiffs.

In 1892 the Wessel family came to the United States. Heinrich was a farmer and for about 15 years certain farm lands were rented on which the family lived. In 1907 he bought an 80-acre farm in Sarpy county, for $8,000, on which a first payment of $1,500 was made. From time to time, for a period of ten years, additional payments were made, from the sale of produce raised on the farm, until 1917, when the last instalment was paid and the farm mortgage was released. In the fall of 1920 one of Heinrich's feet was injured. An infection resulted which required his removal to an Omaha hospital, where it was found necessary to amputate one of his legs. From the infection, and the resulting operation, he died the first week in December, 1921, when he was 74 years of age.

Plaintiffs' contention is that defendant Charles H. Wessel, by the use of undue means, irregularly obtained a deed from his parents to the farm, and that, by like means, he obtained the personal property and money of Heinrich Wessel, all being of the value of $10,000 and upward, and that, under their alleged inheritance rights, plaintiffs are entitled to share equally with their brother Charles in a division of the estate. In behalf of Mrs. Wessel both defendants contend that she is now, and always has been, of sound mind and capable, both physically and mentally, of managing her business affairs. And in behalf of Charles Wessel both mother and son contend that, ever since the farm was bought in 1907, Charles worked continuously thereon, without pay, and that from the farm products the purchase price mortgage

of $6,500 was paid off and the personal property and the money in suit was accumulated, and that this was all accomplished "almost exclusively by the efforts of (Charles Wessel) the defendant," and that no part of such property or money was accumulated nor was it "contributed to in any way by any one of the plaintiffs herein." It is further contended by both defendants that the expressed intention of Heinrich and his wife was to give their real estate and personal property to Charles, and that the deed in suit was executed to preclude a miscarriage of their often expressed intention to give the farm and their personal property to their son on the ground that all of it had been earned by him.

The court found in favor of plaintiffs. Clara Ehlers was appointed guardian of Mrs. Wessel, and the deed of the 80 acres to Charles Wessel was canceled, and "the personal property on said farm at the time of the death of said Heinrich Wessel, the money in bank and the money loaned be, and the same hereby are, assigned and transferred to Clara Ehlers, administratrix with will annexed of the estate of Heinrich Wessel, deceased, to be administered according to law." Mrs. Wessel and her son Charles have brought the record here for review.

Dr. George E. Nehaus, of Omaha, is a specialist in mental and nervous diseases. In respect of Mrs. Wessel's mentality and physical condition he testified that, upon an examination, he found her to be a "remarkably well preserved woman. * * * She spoke in a perfectly coherent and comprehensive manner and she * * * was very much pleased to say that she had never spent a cent for doctors." In a memory test she correctly named the time when the world war began and when our country entered the war. He further testified: "Then I tested her a little bit on arithmetic, asking her * * * how much was 3 times 33, and she said 99; * * * that they sold their butter (for) 35 cents. * * * I said, 'Well, now, if you (sold) 13 pounds * * * for 35 cents a pound, how much would you get?' She said, just off hand, 'Four dollars and be-

tween 50 and 60 cents.' Four dollars and 55 cents is the correct figure." She correctly named the then president and the governor. She said there would be an election next month, the examination in question being in October, 1922. She told the doctor that her son had worked for them for 20 years, without pay, and her husband said the land and money and everything was all his because Charles, as her husband often said, and as she agreed, supported us and that they "couldn't have made a living" if he had left them. And in particular she said that "Charles had always been a good son; that he never drank or did anything wrong and always worked hard. * * * I think it would be very difficult for any one to put anything over on her, to get it away from her. She is shrewd. She understands the meaning of property and she wants it to go to her son because she is carrying out, not only what she thinks is right, but what her deceased husband wished should be done. * * * She was perfectly satisfied to stay there (on the home place) because there wasn't anything that interested her outside." The doctor testified that Mrs. Wessel recognized him when he appeared at the trial, and that her mental and physical condition was then just about the same as when he made his examination, and that he then found her heart, pulse beat, lungs, hearing, and eyesight all perfectly normal with no indication of hardening of the arteries. In her home she appeared much like a German peasant, and she told him she preferred the old home rather than the small new house which was built by her son. Her gown was patched, but clean, and her house was plain, but everything was neat and clean.

Mrs. Margaret Wessel, aged 74 years, testified by the aid of an interpreter. Her evidence seems to corroborate that of the doctor in respect of mentality. She testified that Charles worked for a neighbor from his fifteenth to his eighteenth year, and that his father collected all of the wages which Charles then earned and used it for farm purposes generally; that from his eighteenth year and "for 20 years he worked steady at home," without any wages for

his work; that his father often said that when he died all
of the property should be given to Charles, "because he has
worked for us, * * * because Charles has earned all
that;" that she and her husband often talked "the same
thing over with Charles;" that in 1920 her husband turned
over to Charles $3,000 that he had in the bank, and about
a year before he died, when in the Immanuel Hospital at
Omaha, where he was treated, he executed and delivered a
deed to the 80-acre tract to his son; that Charles gave the
deed to his mother, as directed by his father, and she volun-
tarily signed and acknowledged it a month afterward, name-
ly, March 3, 1921; and delivered the deed to Charles; that
Charles was always a good son to her and to her husband;
that he made her comfortable in her home where, as she
expressed it, "I am boss myself;" that she cooked the meals
and she and Charles ate together in the old home, where
she preferred to live, and that she had no difficulty in per-
forming her housework. It seems that Bernard Ehlers, a
son-in-law of Mrs. Wessel, had reported that Charles ob-
tained his mother's signature to the deed by compulsion.
Mrs. Wessel and Charles both denied that any compulsion
was used in obtaining the deed. It appears that the $3,000,
above referred to, was loaned to a firm of Merchants in Gret-
na. Plaintiffs insist the loan is a bad investment, and they
blamed Charles for making it. But both Charles and his
mother testified that his father talked it over with them and
advised that the loan be made. It also appears that, to build
the three-room house, referred to by Dr. Nehaus, Charles
executed a $1,000 farm mortgage to obtain the money to
erect the building. Plaintiffs complain of this, evidently
as a bit of extravagance, and also because Mrs. Wessel was
not moved into the house when it was completed. But she
testified that she "preferred to be in the old one" and that
Charles slept in the new house. It also appears that Hein-
rich approved of the loan. On the cross-examination, in
referring to a statement of her husband's in respect of the
property, she testified: "Q. In other words, his under-
standing (her husband's) was that Charles wasn't to have

anything until both of you were dead; that is, the father and mother? A. He did not say that. * * * Q. Whose land is this now? A. Charles." And she further testified, on the cross-examination, that she did not want her daughters to have any of the estate "because they did not earn anything; because Charles has earned it all. Q. The girls have always been good to you, haven't they? A. Oh, yes. Q. They used to work, didn't they, years ago? A. After they came out of school they worked for other people and used the money they earned, and then afterwards they got married. Q. And they always came home and helped you didn't they, at times? A. Not much."

Charles Wessel, defendant, was called to the witness-stand by counsel for plaintiffs. On this examination his evidence was corroborative of substantially all of the material evidence of his mother. He testified that his father told him that the 80 acres of land, the personal property, and the money and funds in the bank and such money as was loaned, all of which was derived from the sale of farm produce, should be his because it was earned by him; that his father deeded the 80-acre tract to him, February 3, 1921, while he was at the Omaha hospital, and that he took the deed home and gave it to his mother, and that she voluntarily joined in its execution, as she testified; that the money in the bank and certain certificates of deposit were placed in his name at the bank at his father's direction after the deed was signed and almost a year before he died. On the cross-examination he testified that Ehlers, his brother-in-law, had sought a quarrel with him about the Wessel property, and that his father, with knowledge of this, said, in substance, that a deed might save family trouble, and that it was because of this that the deed was executed; that long before the land was bought, the money earned by him, as a farm laborer, was used by his father to buy a team, wagon and harness; that, as his mother testified, he never received any wages for his work; that within five years of his death his father helped in the hay field and herded the cows on the roadside, but he did little farm work; that farm

help was never hired, but that he, Charles, obtained such needed help, by his labor in changing work with the neighbors; that the $6,500 farm mortgage was paid off four years before his father died, and that all payments thereon, both interest and principal, and the money in the bank was derived from the sale of crops produced on the farm and that they had no other source of income; that his mother always conducted the household affairs.

Rev. Franz Snider was chaplain at the Immanuel Hospital. He testified that Mr. Wessel had a good deal of pain from the operation, but that he "never saw him anything but rational." Mr. Samuel Beveridge, a Burlington steel car maker, was a hospital patient and frequently talked with Mr. Wessel, and said that he told him about the 80-acre farm, and that "his son had always stayed with him — been with him all his life. Seemed to think the world of him." When he signed the deed he was in good spirits, and when he talked "he seemed to be very strong-minded, and when he said anything he seemed to mean it," and that, in his opinion, Mr. Wessel was capable of transacting ordinary business, and that he always seemed to be the same. Joseph Fabian, a storekeeper for the Union Pacific Railroad at Omaha, was a patient during the month of February, 1921. He testified that Mr. Wessel told him, and he heard him tell others, about his farm, and his personal property and that he had a dependable son who took care of his mother and did all of the work. After the amputation Mr. Wessel propelled himself on a wheel chair. From Fabian's contact with Mr. Wessel, his opinion was that he was mentally competent. To substantially the same effect is the evidence of Mr. Glenn Isaacson, a hospital patient, who had frequent talks with Mr. Wessel. At least two witnesses, in the Wessel neighborhood, acquaintances of many years, gave evidence tending to establish the fact of the mental competency of Heinrich Wessel. It clearly appears that the evidence of the witnesses who testified on the part of defendants on this feature of the case was based on facts, which were derived from personal observation, in

respect of each of the parties, and that, being so qualified, they were competent to testify.

Clara Wessel Ehlers and Adelia Wessel Harder were married several years before their father bought the farm and the first payment was made. Neither Mrs. Elizabeth Koch nor Mrs. Emma Warnstedt, nor their respective husbands, offered any evidence. Bernard Ehlers, Clara's husband, testified that his 160-acre farm joins the Wessel farm; that his wife worked out a year and a half before they were married. Elsewhere in the record it is disclosed that the girls, when so employed, earned 25 cents a week at first and afterward earned $2.50 a week. All of the girls were married several years before the farm was bought, and it is not made to appear that any of their earnings contributed toward the purchase of the farm, nor the payment of the mortgage. In fact, it was developed, on the cross-examination of Mrs. Wessel, that the girls "used the money they earned, and then afterwards they got married." Ehlers testified that the old folks lived closely at home and never associated with the neighbors, and that Mrs. Wessel had not been to town for 15 years; that he does not know whether Mrs. Wessel is "strong-minded," but he never saw her coerced into doing anything against her will.

Mrs. Clara Ehlers testified that all the daughters of the family married and left home several years before the farm was bought; that she had no record of money, if any, that they contributed towards its purchase; that her mother told her that it was her father's wish that Charles should have the land. She seems to complain that Charles did not go to the hospital, at Omaha, as often as she thought he should when his father was there. But it is clear that if Charles was so far away his mother would be left at home alone and, besides, without hired help, he had to do all the farm work and take care of the stock.

Mrs. Adelia Harder, on the part of plaintiffs, testified that her parents did not care for finery or high living, but were satisfied to live in a frugal manner, and that her mother's

In re Guardianship of Wessel.

mind had always been keen and bright, and that her mother always insisted in living in the old house, notwithstanding that Charles had built a new house. She admitted that she was married and away from home five or six years before the farm was bought, and that Charles did most of the work on the farm, and that he produced the crops from which the money was obtained to pay off the farm indebtedness.

Rev. Henry Schmidt called on Heinrich Wessel twice at the hospital. He testified, on the part of plaintiffs, that at the first call he was "perfectly normal," but when he made his second call Mr. Wessel "seemed to suffer great pain." But whether from the infection or the amputation of his leg does not appear. He testified: "Q. Well, just tell what you saw and what he said, if anything, and what you observed. A. Well, I tried to talk to him, but couldn't do much with him. He was kinda incoherent in his replies and seemed to suffer great pain, and he would stop in the middle of a sentence or something like that and wouldn't take any interest whatever in what I would do with him." He concluded that Mr. Wessel was not then able "to transact business affairs." On the cross-examination he said he "was keeping in touch with his (Mr. Wessel's) situation" through the "Ben Ehlers family." Mr. Schmidt was the only witness to testify on the part of plaintiffs, who was not financially interested in the outcome of this suit.

Upon examination of the record, we conclude that the judgment is not supported by the evidence. That Charles Wessel by 20 long years of toilsome and unrequited labor raised the crops that supported his parents and paid for the 80-acre farm is the outstanding fact that seems to be clearly established by the great weight of the evidence. And this fact was repeatedly asserted by his parents in the presence and hearing of many unprejudiced and disinterested witnesses, and was admitted by some of the plaintiffs. The evidence seems to leave no room for argument to the contrary. True, the evidence shows that Charles is unlettered and that he is endowed with a somewhat uncouth mode of expression. But his parents bore testimony repeatedly to

his unfailing devotion to their welfare.    There is much meaning in these words of his mother, "for 20 years he worked steady at home," without wages, and of whom his father often said, "because he has worked for us,    *    *    * because Charles has earned all that," all the property shall be his.    And the evidence shows that his father made good his spoken word and that his wife assented· thereto.    So much on the merits as they relate to defendant Charles Wessel.

In respect of the mother of Charles Wessel there seems to be an entire absence of evidence which tends to show that she is "mentally incompetent" or that she is "insane," within the meaning of. section 1589, Comp. St. 1922, nor, from her evidence, does it appear that she is a person of weak mentality.    The evidence of Mrs. Wessel throughout, both in the direct and the cross-examination, discloses that, for a person of advanced years, she is endowed with a keen mind and memory, and that, in view of all the facts, she is in no need of a guardian and such guardian should be discharged.

In *Schley v. Horan,* 82 Neb. 704, it is shown that a son from his twelfth year to his majority, worked in iron mills and gave all of his earnings to his parents and for 20 years afterward faithfully worked on his parents' 120-acre farm without other compensation than his support.    His mother survived her husband a year and, of her own volition, when over 80, deeded the farm, her entire estate, to her son, in consideration of $1 and love and affection.    A married sister of the beneficiary, living with her husband, separate and apart from her parents, sought to set aside the deed on the ground of alleged want of mental capacity and certain "hallucinations" on the part of the grantor in the later years of her life.    But the so-called "hallucinations" were shown to be mostly dreams.    Under the facts we held that lack of mental capacity to execute the deed was not established, and we so hold here.    *Brugman v. Brugman,* 93 Neb. 408, is in point.

The judgment must be, and it hereby is, reversed and vacated, with directions that the title to the land in suit be

quieted in Charles H. Wessel, and that a judgment be entered in conformity with this opinion.

REVERSED.