## APLAND *et al.* v. POTT.

1. Evidence in an action to set aside a deed to defendant from the mother of the parties held sufficient to authorize findings that she had sufficient mental capacity, understood what she did, and acted without undue influence, even if a fiduciary relation existed between her and the grantee.

2. A farmer who visits an old lady's home to view a loss by fire, and finds her ill and confined to bed, and very weak, scarcely able to draw her breath because of a coughing spell, which she had just had, and who does not talk with her, but merely hears her talk with others in a language that he does not understand, does not thereby possess knowledge on which to base an opinion as to her competency to transact business.

3. The charge of the court in an equity case in submitting questions to the jury for special findings, is not subject to review, the findings being merely advisory.

(Opinion filed March 17th, 1902.)

Appeal from circuit court, Turner county; Hon. E. G. SMITH, Judge.

Action by Chloe Apland and others against John Pott. Judgment for defendant. Plaintiffs appeal. Affirmed.

The facts are stated in the opinion.

*Hosmer H. Keith* and *L. L. Fleeger*, for appellants.

A fiduciary relation exists between parent and child, client and attorney, principal and agent, etc. The law seems to be well settled that where such relations exist between the grantor and grantee that the burden of proof is on the grantee to show that the conveyance was freely and deliberately made, to be fair and just and that its execution was not procured by undue influence. The rule of law as we understand it is this: that from the inadequacy of consideration, sickness, age and mental depression of Mrs. Pott, and her helpless and dependent con-

dition, and inference of undue influence arises, and which is incumbent upon the defendant to overcome by proof.

Ikerd v. Beavers, 7 N. E. 326; McCormick v. Malin, 5 Black, 508-523; Marshall v. Billingsly, 7 Ind. 250; McLean v. Equitable Life, 100 Ind. 127; Allore v. Jewell, 94 U. S. 506; Moore v. Moore, 56 Cal. 89; Waddell v. Lanier, 62 Ala. 347; Harris v. Wamsley, 41 Ia, 671.

The rule is that a gift obtained by a child from a father to whom he stood in a confidential relation is prima facie void and the burden of proof is on the donee to show that it was the fair and unbiased act of the donor. Graham v. Burch, 46 N. W., 148; Samson v. Samson, 25 N. W., 233; Tyler v. Gardner, 35 N, Y., 559; Waterman v. Whitney, 11, N. Y., 157; Fitch v. Reiser, 44 N. W., 214.

*Alan Bogue, Jr.*, and *French & Orvis*, for respondent.

A fiduciary relation exists between parent and child as long as the dominion of the parent lasts. While that dominion lasts it lies on the parent maintaining the gift, to disprove the exercise of parental influence by showing that the child had independent advice, or in some other way. When the parental influence is disproved, or that influence has ceased, a gift from a child to a parent stands on the same footing as any other gift, and the question to be determined is whether there was a deliberate unbiased intention on the part of the child to give to the parent. Where the positions of the two parties are reversed, where the parent is aged, infirm, or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child may be set aside. Pomeroy's Eq. Juris. § 962.

FULLER, J.   On the 3d day of March, 1898, for "one dollar, and the further consideration of the grantor's care and support throughout her natural life," Martje Bonneman Pott by warranty deed conveyed her farm, at the time worth about $3,000, to a son, the defendant, John Pott; and this action in equity is by four of her remaining children and two grand children to set aside such deed on the ground that the same was procured by fraud and duress, and is wholly without consideration. Pursuant to the direction of the grantor, expressed in her deed, that instrument was deposited in a certain bank, with the specific direction that the same be delivered to the grantee immediately upon her death; and this was done, and the deed placed of record.   It is conceded that Mrs. Pott died on the 6th day of April, 1900; and at the conclusion of all the evidence, the following questions were submitted to a jury, and its findings thereon were adopted by the court:   "First Question.   Did Martje Bonneman Pott on March 3, 1898, have sufficient mental capacity to understand that she was making a deed to transfer the land in question to her son John Pott, and did she understand that she was then making such deed?  Answer. Yes.   Second Question.   Was the making of the deed in question the free, intelligent, and voluntary act of Martje Bonneman Pott?   Answer. Yes.   Third Question.   Did the defendant, John Pott, by persuasion, or importunities, or by reason of an ascendancy or influence over her will and conduct so strong as to control her acts and will, induce Martje Bonneman Pott to execute the deed to him?  Answer.  No."   There was a decree quieting the title to the premises in the defendant, and plaintiffs appeal.   Mrs. Pott was a woman over 70 years of age, and, with the exception of a

few months, had resided with respondent and his family ever since the death of her husband, which occurred on the 2nd day of January, 1893. For some years prior to the death of the old gentleman, respondent had carried on the farm for his father, and the evidence shows that he leased it from his mother for a portion of the subsequent time, and accounted to her for the rents and profits. When not so leased, it was rented either to the appellant Gerett Pott, or other persons, from whom she appears to have received a portion of the crop. As to the condition of her health during these years, the evidence is very conflicting; but it appears to be reasonably well established that she was subject to periodical attacks of asthma, accompanied with paroxysmal coughing, by which she was greatly depressed for several days thereafter.

While the testimony of the various appellants tends to show that, for two or three years prior to her death Mrs. Pott was very feeble both in mind and body, and, being a native of Holland, was unable to speak or understand the English language well enough to transact business through its employment, we consider the following material facts established by a fair preponderance of evidence: For a short time after the death of her husband she resided with her son Gerett, but, on account of the little children of the family, it was not congenial; and she returned to the home of respondent some time during the year 1893, and continuously thereafter occupied an apartment erected as an addition to his home for her especial benefit. Soon after moving into this room, when congratulated by her pastor on account of her pleasant surroundings, she responded, in substance, as follows: "I am pretty comfortable. I could not stand the children at Gerett's, so John built this room for me,

and I take meals with them. But he will not lose anything by it, for, if he takes care of me as long as I live, I intend to leave what I have to him." She appears to have looked after all business matters connected with her farm as well as the average woman of her age could do, and, with the exception of her daily meals, which were taken with the family of respondent, she provided herself with such of the necessaries of life as she deemed proper, including clothing and household furniture, She also contributed money to the support of the church to which she belonged.

Pursuant to the direction of his mother, respondent from year to year took her share of the grain to market, and promptly accounted for the proceeds. Concerning the manner of doing the work, one witness for appellants testified as follows: "I have been buying grain the last 5 or 6 years at Hooker. I handle coal, lumber and grain. I knew that John Pott transacted business for his mother during four years preceding March, 1898. During the years 1895, '96, and '97, he brought grain there that he claimed was raised on his mother's land, and was her share of the crop, and he received the pay for it. Each time that he brought the grain he had me make out a statement showing the number of bushels that was her share of the proceeds paid. Said he wanted to show it to her, so she could know just what her share was."

Stephen J. Harmeling testified as follows: I live at Marion Junction. Have lived there 18 years. I was acquainted with the deceased, Mrs. Pott. I am acquainted with the defendant, John Pott. Had known them more or less frequently during 1897, '98, and 1899. I saw Mrs. Pott occasionally, and during the year 1897 I should say about once in every eight

weeks. My clerical matters took me over there. I saw her at John Pott's house. I had conversation with her. I would go to see her, as she was an old lady, whenever I was in Hooker, and talked with her in English, and sometimes in Dutch. She was not very proficient in Dutch, as I could not understand it very well, so I conversed with her mostly in English. I had no difficulty in understanding her or making her understand me. I never noticed anything mentally wrong with her during the year 1897. I should judge she was competent mentally to do business, such as she had to do or was doing. I saw her during the year 1898, prior to March 3d. I could not state the exact time, but I know that about once in eight weeks I was due to preach in Hooker, in the church, and that was in my circuit, and of course I would go there, and whenever I was at Hooker I would go to see Mrs. Pott. I cannot fix the exact date, only so far that I saw her once in eight or nine weeks. It was sometime between the 1st of January and the 3rd of March of that year."

J. J. Pelmulder, the father of the appellants Katie and William, married a daughter of Mrs. Pott, and visited the old lady once or twice a year during the time that she lived with respondent. He testified, in part: "I do not remember seeing her in 1898, prior to March. The last time I remember being there was about April 15, 1898. I saw her in the fall of 1897. * * * Q. Now, you may state if during these times when you saw her in 1895, '96, and 1897, you saw any difference in her mental condition from what it had been when you knew her four or five years before that? A. I never noticed it. I never noticed any difference. At these times when I saw her I talked with her and visited with her. Q. You may state

whether at these times, in your opinion she had sufficient capacity to transact ordinary business. A. Ordinary business; yes sir. Cross-examination: * * * I visited the deceased, Mrs. Pott, in the fall of 1897, about October. I always found her in her room. She seemed to be apparently well. I remembered she was sitting up. I had been here in the spring of the same year. * * * I have nothing against any of my sisters-in-law or brothers-in-law."

The family physician, Dr. Richard Finlay, had known Mrs. Pott for about 17 years, and had called upon her professionally during the years 1896, '97, and 1898, when she had attacks of asthma. He was present at the time the deed in question was executed, and concerning the transaction testified as follows: "John Pott came in for me to go out and see his children, and requested me to take Mr. Bogue along. Bogue asked me to witness the deed. I asked him if she knew what she was doing, and he said 'Yes;' that he had written, and she had dictated it to him. I told him he had better take and read the paper over to her. He read it to her. I asked her if she understood it, and she said she did. I asked her if this was her own choice and free will, and she said, 'I guess I know my own business'—just like that. Before I signed my name to it I took the paper and read it. I handed it to Mr. Bogue. He said the deed would have to be placed in the bank. We stopped there for dinner. Old Mrs. Pott was at the dinner table. She walked to the table. She engaged in conversation at the table. I have been going to see her more or less since I have been in the county. I did not see any difference in her physical condition and mental condition during the years 1894, 1895, and 1896. She could walk around and get about the same

as the rest of us, except when she had an attack of asthma. I saw her when she had these attacks, and noticed the effects. There would be difficulty of respiration, and she suffered a great deal until the attack would pass away; also coughing. As far as I noticed, she was in the same condition of health and mental condition as she had been during the years before. * * * Mrs. Pott was in her room when we first went in. I went out to see the child while Mr. Bogue made out the paper. It was probably twenty or thirty minutes. During this time John Pott was out of the room with me, with the child. I do not recall whether Mr. Bogue brought out the paper, but he came and asked me to witness it. I signed that paper on Mrs. Pott's table, in her room. Mr. Bogue read it to Mrs. Pott and me at my request. He read it to her in plain English. I did not talk to her in Dutch. He asked me to witness her signature, and, before she signed it, I told him to read it to her. I saw Mrs. Pott make her cross. * * * The old lady came to the dinner table. She did not appear to be nervous at all, and she sat there and ate her dinner with the rest of us. I do not know her exact age. Think she was about 75. Not more infirm than you would expect of a person of her age. I think asthma was the only thing that ever troubled this woman. I examined her heart and lungs. I was never there in 1877. I may have been there once or twice in 1897. I do not know exactly. I can tell by looking up my books. * * * She made the cross herself. I may have been to see her both in 1896 and 1897. She could talk English so that she could understand what I said, and I could understand what she was saying."

Alan Bogue, Jr., the lawyer who drew the deed at her

dictation, testified, in part, as follows: "She gave me the directions as to how it should be drawn. I talked with her before I drew the deed, She talked English, and understood it very well. When I went in, I spoke to Mrs. Pott, and she wanted to know if this was Mr. Bogne. I said, 'Yes.' She said she had often heard of me through the Rev. Nicholson, and she asked me if I was still going to the Reform Church. I told her I was. I think John and Dr. Finlay had gone into the other room before this. She says, 'I would like to make some disposition of my property.' I told her that John had told me that; that I had come out for that purpose, I asked her how she wanted to dispose of this property, and she said, 'Well, I would like to dispose of it in such a way that whoever gets it would not be put to any costs after I die;' that the estate of her husband was probated, will was made, and it cost them over $100, and she did not care to have the party that got the property put to that expense, if it could be avoided. I had with me at that time both a blank deed and a blank will, and I told her that I thought that she could make a disposition of that property by making a deed, and deposit that deed in escrow with some third party, or with the bank, directing that third party— that bank—to hold that deed until she died, and at her death to be delivered to the grantee. She wanted to know, if a will was made, if it had to be probated, the same as the other. I told her it would. She said she would rather dispose of it by deed, in the way I had suggested, and I asked her who she wanted to deed the property to, and she said she wanted to deed the property to John. * * * 'He has always been good to me, and I want him to have this property when I die.' That is, this quarter section of land in dispute here. And I

16 S. D.—13

said to her at that time that she probably ought to recognize some of the rest of the children, and she wanted to know whether it would make any difference whether she left them any money or not. I told her, with the deed it would not make any difference; she did not need to leave them a dollar, if she did not want to; but if she drew a will she had better probably recognize them and give them something—one dollar or anything she was a mind to give them. 'Well,' she says, 'you can draw a deed;' and I proceeded to draw the deed, and I told her I would like a description of the property, and she went to the bureau drawer that was in her room and brought out some papers. I think it was an old deed. I am not certain about that, but the description of this property was in that paper, and I copied the description from that paper, and I remembered this distinctly: That, in the description of the paper she brought, it had 'Territory of South Dakota,' instead of the 'State'—different, I remember now. I drew up the deed, and read it to her. I says, 'Mrs. Potts, do you understand what this deed is?' She says, 'I do.' 'Now,' I says, 'that conveys this quarter section of land to your son John;' and she said, 'That is what I want, and I want that property conveyed to John when I die.' And I went out and asked Dr. Finlay to come in and witness her signature, and the doctor came in, and he kind of smiled and said: 'Mrs. Pott, I want you to understand that instrument. I would like to have Mr. Bogue read it over again.' I told him that I had read it, and he said, 'Read it over again, as I had not heard it;' and then I read it over again, and the doctor asked her if she understood what that instrument was, and she said, 'Doctor, I guess I know my own business;' and after that I had her sign it by mark, and after she

signed by mark I signed as a witness my signature, as upon the deed, and Dr. Finlay then signed. Cross-examination: Q. Can you tell this jury that the old lady could talk English to you fluently? A. I have not stated that, but she could make her wants known very clearly, although she spoke somewhat broken. I could understand her. We talked in English. She could understand me."

Though respondent and his mother were always on amicable terms, the undisputed evidence shows that she kept her money, valuable papers, and other personal effects in her actual possession, separate from anything belonging to him; and it is, indeed, quite doubtful whether the facts and circumstances in evidence will justify the inference that a fiduciary relation existed between them. We shall not here produce the testimony offered on the part of appellants in support of their complaint, and it would be useless to set forth all the evidence by which we are firmly convinced that Mrs. Pott, though advanced in years, and at times greatly afflicted with asthma, was a woman of ordinary intelligence, continuity of purpose, and disposed to manage her own affairs. It was shown that she had surrendered to respondent two promissory notes which she had against him, amounting to $270; and were it to be assumed that the deed was practically without pecuniary consideration, and that a fiduciary relation existed between the grantor and grantee, it would still be patent that all presumptions and inferences entertainable against the transaction are overcome by the preponderance of competent proof. Nor does the fact that appellants were not advised prior to the death of the old lady that the deed had been executed and placed in escrow for the future benefit of respondent import militating

significance.   The trial court was therefore amply justified in
finding that at the time the conveyance was made she fully
comprehended the nature of her free act and deed, understood
enough English to transact the business, and possessed suffi-
cient mental capacity to exercise mature judgment.

Sometime during the winter of 1898 Mr. Monk, a farmer,
visited Mrs. Pott's place to view the loss of a farm house con-
sumed by fire, and found the old lady quite ill and confined to
her bed.   He did not speak to her at all, and all the conver-
sation she had with others was carried on in a language that
he did not understand.   After stating the foregoing facts upon
the witness stand, and that she was very weak, and could
hardly draw her breath, on account of a coughing spell through
which she had just passed, the following question was asked
by counsel for appellants, and the sustaining of an object-
ion thereto on the ground that no proper foundation was laid
is assigned as error:   "From what you saw and heard that
day of the condition of Mrs. Pott, Mr. Monk, what would you
say as to whether she was competent to transact ordinary busi-
ness, or not, at that time?"   Assuming that a determination of
the matter was not within the exclusive province of the court,
the witness possessed no knowledge upon which to base the
conclusion for which the question called, and his answer was
promptly excluded.   It was error to permit other witnesses
to testify concerning the competency of Mrs. Pott to make the
deed in question, appellants are in no position to complain, for
the reason that they were all allowed, while on the witness
stand, to freely express their opinions with reference to the
matter, and the record discloses nothing pertaining to the
action of the court in the reception or rejection of evidence
that would justify a reversal.

An exception was also taken to the charge of the court in submitting the questions to the jury for special findings, but in view of the fact that such findings were merely advisory, entitled to but little weight, and may be wholly disregarded, the assignment of error relative thereto requires no consideration. Meyer Boot & Shoe Co. v. Shenkberg Co., 11 S. D. 620, 80 N. W. 126; Sweetser v. Dobbins, 65 Cal. 529, 4 Pac. 540; Hewlett v. Pilcher, 85 Cal. 542, 24 Pac. 781. In the case of Danielson v. Gude, 11 Colo., at page 96, 17 Pac., at page 287, the court says: "The errors assigned upon the action of the court in refusing the several requests of appellants to submit certain questions of fact to the jury, and the error assigned upon the action of the court in submitting certain questions of fact to the jury, and the errors assigned upon the action of the court in giving and in refusing to give certain instructions to the jury, are each and all of them determined by the holding that the case was properly triable by the court. Whether any question of fact, and what questions of fact, shall be submitted to a jury in such cases, is a matter resting wholly in the discretion of the court; and when the court, in such cases, submits to a jury certain specific facts, neither party has the right to ask the court to instruct the jury, because the court is not in any manner controlled by the verdict." In Conran v. Sellew, 28 Mo. 320, the rule applicable to cases in equity is stated thus: "The issues of facts in an action brought to obtain the surrender and cancellation of a promissory note must be tried by the court, unless the court takes the opinion of a jury upon some specific question of fact involved therein, by an issue made up for that purpose. Where the trial must be by the court, instructions or declarations of law in the form of instructions

are not required, and, if given, will not be reviewed or noticed by the supreme court." This well-settled principle is often announced in the adjudged cases, and the decisions of this court, so far as applicable, are consistent therewith.

A studious examination of the entire record disclosed no error occurring at the trial, and the judgment appealed from is affirmed.