ANSTED, Respondent, v. GRIEVE, Appellant.

(231 N. W. 912.)

(File No. 6856.   Opinion filed August 12, 1930.)

*J. H. Lammners,* of Wessington Springs, and *Miller & Shandorf,* of Mitchell, for Appellant.

*Chas. R. Hatch,* of Wessington Springs, and *Gardner & Churchill,* of Huron, for Respondent.

BROWN, P. J. At the time of his death Thomas D. Williams was about eighty-five years of age and for more than forty years had resided in Jerauld county, and he owned four quarter sections of land there. He was a native of Wales, a bachelor, and had no near relatives except a brother living in Wales, with whom it appears he had not kept up much correspondence for a long time. Defendant had for thirty-two years been a neighbor and acquaintance of Williams in Jerauld county and had often helped him with farm work and business matters. Williams was a frequent visitor at defendant's home and defendant's wife did many acts of kindness to him, such as washing, ironing, and mending his clothes,

baking and cooking for him, and defendant and his wife gave him some care when he was ill and took him on several occasions to town to a doctor. In June, 1927, Williams was taken quite ill and defendant took him to Mitchell to see a doctor. On the 14th of the month Williams became a patient in the hospital at Mitchell, and on Sunday the 19th, George Sickler, in response to a phone call from Dr. Scholl, went to Mitchell and visited Williams at the hospital. He arrived about noon and stayed with Williams until about 11 o'clock at night, at which time he procured the signature of Williams to a will which he prepared while there, whereby Williams gave all of his property of every kind to Junior College at Wessington Springs and appointed Sickler sole executor without bond. Sickler says they first talked about the will soon after he arrived at the hospital, that the will was not signed until about 11 o'clock, that he did not go there to get Williams to make a will, that he did not work on him to get him to sign the will, that it was no trouble to get him to sign the will, that Williams in the conversation, referring to defendant said, "I owe Walt nothing; he has been a traitor to me." The will was duly admitted to probate, and, Sickler waiving his right to be appointed executor, Harry B. Ansted was appointed administrator with the will annexed. Williams remained in the hospital until about the 1st of August, when, being somewhat improved, he left and went to his home in Wessington Springs. On July 18th, while he was in the hospital, he made a deed of the real estate in controversy to defendant, which deed was recorded on October 21st, three days after the death of Williams. This action is brought by the administrator for the purpose of determining the adverse claim of defendant under the deed, and from judgment setting aside the deed on the ground that it was obtained by undue influence of the grantee, and because it was never delivered, and from an order denying a new trial defendant appeals.

Williams was brought back to the hospital on October 8th, and remained there as a patient until his death on October 18th. On October 16th, the doctor who attended him wrote a letter, at his request to Sickler, who was then in California, asking him to return the will, as there were some changes that he desired to make, and requested an immediate answer by airplane mail. The will was not returned. The doctor who attended Williams while he was at the hospital in June and July testified that in July, in a conversation

he had with defendant, defendant said that the college authorities were trying to get Mr. Williams' property away from him and he was going to see that they did not get by with it. In addition to the property owned by Williams in Jerauld county, he owned some land of small value in Minnesota, and there was testimony that defendant said, after the death of Williams, that if he had lived twelve hours longer he (defendant) would have had a deed to the Minnesota land also. The testimony as to the execution and delivery of the deed to defendant for the Jerauld county land is substantially as follows: D. C. Wallace, an insurance agent at Mitchell, who had known both Williams and defendant for over thirty years, visited him at the hospital while he was there in June and July. During the conversation Williams said that he was worrying over a document he had signed and given to Mr. Sickler, in which there was something said about the college at Wessington Springs, and that Williams did not seem to know what it contained. He told Wallace that he would like to have him get word to defendant that he wished him to come down to Mitchell because he wanted to see him. Wallace wrote defendant telling him of Williams' desire and Grieve came to Mitchell and called on Wallace at his house, after which both of them went to the hospital and saw Williams. In the conversation that occurred at this time, Williams again said that he had signed some document and given it to Sickler and was not clear as to its contents and desired to execute some other document that would revoke what he had given to Sickler. Wallace told him that he might make another will, which would accomplish that purpose, but Williams said he did not desire to do this, whereupon Wallace told him that he might make a deed of the property to any one he desired to give it to, and that would eliminate whatever was in the paper he had given to Sickler, and that Williams told him to go ahead with this; that thereupon he went down town and got his notary seal and defendant went and got a blank deed. When they returned Williams said to defendant, "Walt, how will we fix this?" and that defendant said, "I haven't a word to say, Tommy, you fix it to suit yourself and it will be all right with me," and thereupon Williams told Wallace to make out the deed of the land to Walt, that he desired to give him all of the Jerauld county land; that he then wrote up the deed; that Mr. Williams read it and said that "That is all right," and signed it; that he then

attached his certificate of acknowledgment and handed the deed to Mr. Williams, who then handed it over to Mr. Grieve saying, "Walt, take care of that, it is valuable"; that in the course of the conversation before the execution of the deed Williams said that he had signed the document which Mr. Sickler got from him because Sickler had kept at him the greater part of the day and he finally signed it to get rid of him so he could rest. Wallace testified that he had known Williams' mental condition during all of the thirty years of his acquaintance, and that at the time he signed the deed there was no difference in his mental condition than what it had been prior to his illness. Subsequent to the execution of the deed Williams paid the taxes on the land, and Sickler testified that subsequent to the execution of the deed Williams spoke to him about going to California, and said that he might need some money and offered to give Sickler a mortgage on the land in that event. There was also some testimony on behalf of plaintiff to the effect that Williams, after the execution of the deed, had spoken of renting a portion of the land to certain parties, and on the other hand there was testimony that parties who had gone to him to rent the land were told to go and see defendant, that defendant was now the owner of the land.

There was testimony that, after he came back from the hospital in August, Williams said that he believed Sickler had doped him; had brought his so many drinks of water the day Sickler was at the hospital and got the will; that Williams spoke with great appreciation of what defendant and his family had done for him; that during that period he had told an auctioneer who spoke to him about the selling of his property that he had but little personal property left and what he had, when he was through with it, Walter could take it; that he had deeded his farm to Walter and said he had always been very good to him and he had never asked him for an accommodation that he did not get; that if he could persuade defendant and his wife to go with him, he would go by car to California and make that his future home and that the rent from the land would keep him.

■■ We think a good deal of relevant testimony offered by defendant was excluded on objections by plaintiff's attorneys through a mistaken view of the effect of section 2717, Rev. Code 1919, as to transactions with the decedent, but, as we deem the

evidence insufficient to justify the decision that the deed was invalid, the exclusion of such evidence, on behalf of defendant, need not be considered in detail. Further discussion of the circumstances surrounding the procuring of the will by Sickler is unnecessary, because, if the deed is valid, the will so far as the property described in the deed is concerned, was revoked on the delivery of the deed. Rev. Code 1919, § 634. It is apparent that the most that can be said from the evidence in the case is that defendant had opportunity to exercise undue influence, but there is no evidence from which it can be said that he did so. While Sickler testified that on the occasion, when he procured the will, Williams said defendant had been a traitor to him, it nevertheless appears that subsequent to that time, while in full possession of all his mental faculties, Williams frequently spoke to his neighbors in terms of deep appreciation of what had been done for him by defendant and defendant's wife, and that also while in full possession of his mental faculties he directed the deed of the land to defendant to be prepared by Wallace and knowingly signed and acknowledged it. Opportunity alone for the exercise of undue influence does not warrant the setting aside of a deed. Walsh v. Walsh, 38 S. D. 628, 162 N. W. 398; Gillette v. McLaughlin, 44 S. D. 499, 184 N. W. 277; Peterson v. Imbsen, 46 S. D. 540, 194 N. W. 842.

██ It is contended that there was no delivery of the deed with intent that it should pass immediate title. But a deed duly signed and acknowledged and produced by the grantee is self-proving as to delivery, and the burden of proving nondelivery is upon the party claiming that it was not delivered. Heavner v. Kading (Iowa) 228 N. W. 313. The only evidence that it is claimed overcomes this presumption is testimony to the effect that Williams, after the execution of the deed, paid the taxes on the land, and that defendant is said to have told parties who spoke to him about renting the land that they would have to see Williams, and the testimony that Williams spoke of mortgaging the land to get funds to keep him in California, and that he desired defendant not to record the deed until the will got back from Sickler. But while the declarations of a deceased person in the possession of land, explanatory of the character of his possession at the time, are admissible, "the rule is well supported which confines the admissibility of such declarations to explanations of the claim of possession, and

excludes such as travel beyond the limit referred to, either in the nature of questions of his predecessor's title or that of some adverse claim, or as it is concisely put in an Alabama Case," the doctrain can not be extended to include declarations "as to the history and source of such title." Jones Blue Book on Evidence, § 352.

"Such declarations are only competent to show the *character* of the *possession* of the person making them, and by what title he holds. They are *not competent to sustain or destroy the record title;* and declarations contrary to the tenor of deeds or similar documents which a party has executed are not admissible. Id., § 354.

Again, the same author at section 241, speaking of admissions by a grantor in disparagement of the title of his grantee, says: "But the declarations are not competent, if made *after* the *grantor has conveyed away his interest* in the property in question, since the acts and declarations of the grantor after he has divested himself of his estate cannot be admitted to impeach the title of the grantee, *unless* there is proof of collusion or of some fraudulent scheme between the grantor and grantee."

In O'Brien v. O'Brien, 19 N. D. 713, 125 N. W. 307, 309, it is said: "A grantor, having effectually conveyed the title to another, cannot thereafter impair such conveyance by her subsequent acts or declarations. But if the intent to deliver absolutely is not shown, or if such intent remains in doubt, subsequent acts or conduct of the parties are admissible to show what the intent actually was at the time that the delivery to the depositary was made." That was a case where a deed was delivered to a depositary to hold until the death of the grantor and then to deliver it to the grantee, and the question was whether the delivery was with intent to place the deed absolutely beyond the control of the grantor.

In the instant case we think the intent to deliver the deed absolutely is shown by the evidence. Wallace, who drew the deed, and who does not appear to have any interest in the matter, had been acquainted with Williams for at least thirty years, and visited him at the hospital in June, 1927. He testifies that during that visit Williams told him that he was quite worried, he had signed and given to Mr. Sickler some document and he did not know what it contained, but he would like to have Wallace get word to Grieve, telling him to come down to the hospital, as Williams wanted to see him. When Grieve came, in response to this

notification, Wallace went with him to the hospital, and there Williams expressed a desire to execute some document that would eliminate the one he had given to Sickler. On being told that this could be done by making a deed to the property, Williams said to Grieve, "Walt, how will we fix this?" to which Grieve replied, "I haven't a word to say, Tommy, you fix it to suit yourself and it will be all right with we," whereupon Williams told Wallace to make a deed of this section of land to Grieve. This was done, and, after it was written up and signed and acknowledged, Wallace handed the deed back to Williams, who had read it, and then handed it to Grieve saying: "Walt take care of that, it is valuable." Wallace testifies that he had known Williams' mental condition during all those thirty years, and that at the time of the execution of the deed there was no difference in his mental condition than what it had been prior to his illness. Several other witnesses testified to declarations of Williams prior to the time the deed was executed, in which he stated in substance that he intended to give this land to Walt, meaning Mr. Grieve. We think the clear preponderance of the evidence is against the trial court's finding that the deed was not executed by Williams with intent to transfer title to Grieve. The judgment and order appealed from are reversed.

POLLEY, SHERWOOD, CAMPBELL, and BURCH, JJ., concur.