MEYER, Respondent, v. KIECKSEE, Appellant

(298 N. W. 261.)

(File No. 8394. Opinion filed May 26, 1941.)
As Modified July 17, 1941.

**Loren G. Atherton,** of Flandreau, **Evans & Evans,** of Pipestone, Minn., and **Danforth & Danforth,** of Sioux Falls, for Appellant.

**Rice & Rice,** of Flandreau, for Respondent.

POLLEY, P. J.  This is a suit in equity brought to cancel and set aside a deed to a piece of real property, on the ground that the deed was obtained by fraud, misrepresentation and undue influence.  Fritz Kiecksee was the grantor. He was a German by birth and could speak and understand the German language, and knew enough English so that he could carry on a conversation in English, but not so well as he could in German.  In 1916 he was the owner of two quarter sections of land (W½—34—108—47) near the town of Ward in Moody County.  He had gone upon this land, farmed it and occupied it as a home since 1902.  He had a family consisting of his wife, four sons and one daughter; two of the sons, Herman and Helmuth, lived out of the state and do not appear from the record to have ever lived in this state.  The other two sons, William and Henry, were farmers living in Ward Township.  The daughter, Mrs. Zarecky, lived in Colman, in Moody County.

In the fall of 1916 Kiecksee entered into an agreement in writing with his son William, whereby he agreed to convey to William the NW¼ of said land upon the payment by William of $12,800; $1,000 of said sum to be paid on the 1st of March, 1917, and the balance at the rate of $300 per year with 6% interest on the unpaid balance until it was all paid. On the 1st of March, 1917, Fritz and his wife, who were then residing on the said quarter section of land, moved into a house owned by him in the said town of Ward; William moved onto the land described in the contract, and contin-

ued to reside there until the trial of this case. He paid the interest in full at the rate of 6% up to the 1st of March, 1922, amounting to approximately $2,400, when Fritz, without solicitation, reduced the rate of interest from 6% to 4%, and William paid the interest at 4%, amounting to approximately $2,800, until the 1st of March, 1932.

Just when and in what amounts William made payments for the land does not appear from the record, nor is it material, because it is admitted by all parties concerned that by the 1st of March, 1932, he had paid all of the interest that had accrued up to that date and in addition thereto had paid $5,800 on the principal. No payments have been made since that date.

About the 8th of March, 1934, Mrs. Kiecksee died. This, in the opinion of Henry, who expects to profit largely by this lawsuit, affected Fritz's mind to such an extent that he was never rational thereafter, but nothing in his conduct showed any change. He continued to live in the home that he and his wife had been occupying; kept house for himself, and did his own cooking, except that Henry's wife testified that she came to town once or twice a week and brought him some "eats" and cleaned up the house for him. Henry and his wife were then living on the S.W. ¼ of said Section 34.

During the month of April, 1934, the month following the death of Mrs. Kiecksee, Fritz made his will. The first mention of the will was by Fritz, who said to Henry: "When you have time come and take me into Elkton." "He said he was going to make a will." Soon after that Henry took him up to Elkton and on their arrival at Elkton they went to the Corn Exchange Bank, whose managing officers, Lester Forman and Robert Petschow, were German and talked and understood the German language. Fritz had been doing business at this bank off and on for the past thirty years and had unbounded confidence in the officers thereof; and he went to this particular bank on this occasion because he could do business with the officers of the bank in the German language. Fritz told Lester Forman, the president of the bank, in German, that he wished to make his will. The

matter was talked over in German and Mr. Forman drew the will. In this will Fritz left the S. W. ¼ to Henry, subject to a legacy of $500 Henry was to pay to Helmuth; the N. W. ¼ of the section was left to William, subject to a legacy of $500 William was to pay to Herman. He then devised his house and lot in the town of. Ward to Henry's wife. Mrs. Zarecky had borrowed $1,000 from Fritz some years before and this indebtedness was canceled by the terms of the will. His other property consisting of some cash, bank stock and other personal property was to be divided equally among his five children. The will, when so drawn, was executed by Fritz and left in the bank. Henry was present throughout this entire transaction but testified that he took no part in the preparation of the will, or the disposition of the property, other than to act as interpreter for Mr. Forman and his father. The making of this will and the disposition of the property made thereby was pursuant to a determination made by Fritz several years before and which had been frequently talked over with members of the family before the death of his wife.

During the time between the execution of the contract for the sale of the land in 1916, and 1934, the land had depreciated in value to such an extent that by 1934 the land was not worth more than $40 to $55 per acre. William had already paid this amount on the contract, and it appeared to Fritz that it would work an unfair hardship on William to compel him to pay another $7,000 for the land when he had already paid all the land was worth. This situation was talked over to some extent. by William and his father, but William did not suggest that Fritz should forego the making of further payments on the land and nothing was said by William at any time about the execution of a deed. About the latter part of June, 1934, Fritz met William on the street in the town of Ward one day, and Fritz asked William (quoting from the transcript): "* * * if I had a little time and could come in as he wanted to go to Elkton and wanted me to take him and he said he was going to give me a deed." (This is the first time the making of a deed had been mentioned by anyone). A. "I said alright." Q. "Did

he tell you he wanted you to go?" A. "He wanted me to take him up" (meaning to the town of Elkton). Q. "But what he wanted you to pay." A. "He said I had so much in there, and that was enough. He said the whole half section cost him $7200 and I had paid this much in there and that was enough. He was going to give me a deed." Q. "Did you say anything about what you would do for him?" A. "No." Q. "Didn't you say you would pay as you were able to pay?" A. "After I had the deed?" Q. "At the time you got the deed or about that time?" A. "No, I don't know that I did." Q. "Did you tell any of the other members of the family that you had gotten a deed to that quarter section?" A. "Not at that time."

On arriving at Elkton they went to the bank above mentioned where Fritz told Mr. Robert Petschow (one of the bank officials), in German, that they had come to have him draw a deed; that he was going to deed William the land he had sold him; that William had paid him all the land was worth and that he wanted to give him a deed without further payments. Mr. Petschow said he would prepare the deed and proceeded to do so. When the deed was written Fritz signed it and Mr. Petschow, who was a notary public, took his acknowledgment. The deed was then turned over to Fritz and he in turn gave it to William. All of their talk relative to the preparation and execution of the deed was carried on in the German language. On the 13th day of July, about two weeks after the execution of the deed, William filed it for record in the Register of Deeds office, in and for Moody County. When Henry learned that William had a deed for the land he was greatly angered and claimed that William had secured the execution of the deed by the exercise of undue influence, and that the same was void. Had William been required to pay the balance due under the contract and the interest thereon, said money could have gone into the old man's estate and Henry, as an heir of his father's estate after the old man's death, would have been entitled to a portion of the same. What, if any, pressure was brought to bear on Fritz to induce him to start a suit to nullify the deed does not appear from the record, and no

action of any kind appears to have been taken until the 30th day of November, 1937, when Henry, and apparently his brothers and sister, petitioned for and secured the appointment by the County Court of Moody County of a guardian of their father's estate, and on the 26th day of April, 1939, five years after the execution of the deed this action was commenced by said guardian to set aside and cancel the said deed.

Plaintiff in his complaint alleges that at the time of the execution of the deed, Fritz Kiecksee was not of understanding mind and was incompetent and incapable of transacting any business, and plaintiff further alleges as follows: "That the defendant William Kiecksee is a son of the said Fritz Kiecksee and a person in whom he relied in the conduct of his business; that on the 29th day of June, 1934, the said Fritz Kiecksee was approximately 83 years of age, in feeble health and, as petitioner is informed and verily believes, mentally incompetent, and on the said day the said William Kiecksee fraudulently and by means of undue influence then and there practiced over and upon the said Fritz Kiecksee, induced him to execute and deliver to him a warranty deed purporting to convey to him the real property described and to release him from all obligations on the contract for deed referred to; that the deed referred to was filed for record in the office of the Register of Deeds of Moody County, South Dakota, on July 13, 1934, and recorded in Book 44 of Deeds, page 230."

The case was tried to the court; findings of fact, conclusions of law and judgment were in favor of the plaintiff and the defendant appeals.

In the findings of fact the court found that at the time of the execution of the deed involved, Fritz Kiecksee, the grantor therein named, was 83 years of age; that he was infirm with age, in feeble health and mentally incompetent to transact ordinary business; and at that time and for several years prior thereto he relied upon his sons, Henry Kiecksee and the defendant, William Kiecksee, in the transaction of his business and that in all business relating to the real

property above described he placed entire confidence and trust in his said son, William Kiecksee; that a confidential relationship existed between the defendant, William Kiecksee and his father, Fritz Kiecksee, as to all business relating to said real property; that the said Fritz Kiecksee relied upon his son, William Kiecksee, to keep the record and accounts · due and owing on the said contract for deed and that such contract is now lost so that the terms and conditions thereof cannot be ascertained; that on or about the 29th day of June, 1934, the said William Kiecksee prevailed upon his father, Fritz Kiecksee, to execute and deliver to him a warranty deed conveying to the defendant, William Kiecksee, the real property above described; the court further found as a fact that there was no consideration for the execution of said deed; and this in the face of the admitted fact that William had already paid $11,000, principal and interest to apply on the purchase of said quarter section of land; and that at the time of such execution the mind of Fritz Kiecksee was clouded and he was unable to understand or grasp the extent and nature of the transaction and did not understand the effect thereof and was mentally incompetent to execute such instrument.

Fritz Kiecksee being of legal age is presumed, until the contrary is shown, to be competent to transact his own business, and in order to prevail in this action plaintiff must show the existence of incompetency, and he has the burden of proof to establish incompetency, and that such incompetency existed at the time of the execution of the deed. What his condition may have been prior to that date or on any date thereafter is wholly ·immaterial unless it has a tendency to show his condition on the day he executed the deed. Many pages of testimony are found in the transcript relating entirely to Fritz's condition for a period of three to five years after the execution of the deed, and that has no tendency to throw any light upon his condition at the time of the execution of the deed, and therefore has no relevancy to the question involved, and will be given no further consideration. The court found he was in feeble health and men-

tally incompetent to transact ordinary business. The evidence does not show that Mr. Kiecksee was in feeble health at that time. The evidence shows him to have been a remarkably well-preserved man for his age, in robust health, and rational in all his acts and conduct.

Upon the question of Fritz Kiecksee's mental ability to execute the deed involved, it must be remembered that he was the absolute owner, except for William's right to purchase the land, and had a right to sell it or give it away, or do anything with it that might suit his fancy; and plaintiff having asserted incompetency must prove incompetency.

While the suit was brought by Theo. F. Meyer as guardian, it was brought for the sole benefit of the three brothers of defendant, and their sister, Mrs. Zarecky; and they all testified at the trial. Each of these witnesses are interested in winning this suit to the extent of $2,000 to $3,000 apiece.

At the trial of the case Peter Jurgens, F. M. Pottratz, Dan Ryan, F. M. Bucholtz and Robert Petschow testified as to the mental condition of Fritz Kiecksee at the time of Mrs. Kiecksee's death and at the time of the execution of the deed. These witnesses were all residents of the town of Ward or vicinity and have been acquainted with Mr. Kiecksee from 25 to 35 years prior to the execution of the deed. These men had been intimately acquainted with Mr. Kiecksee; they had met him socially and to some extent in business matters during all of those years, and all of them testified positively that from a time prior to Mrs. Kiecksee's death down to and including the execution of the deed, they never saw anything of Mr. Kiecksee that suggested to them in any way that he was of unsound mind, irrational, or incompetent. None of these witnesses had any pecuniary interest whatever in the outcome of the case.

Before a deed can be set aside because of the grantor's mental incompetency to execute the same it must be shown that at the time of the execution of the deed he was so weak mentally as not to be able to comprehend the nature and effect of the transaction involved, and if Mr. Kiecksee, at the time the deed was executed, knew what he was doing

and intended what he was doing, the deed should not be annulled. Norby v. Sagen, 64 N. D. 376, 252 N. W. 383. This is a recent North Dakota case. The grantor in the deed involved in that case was in a much weaker condition mentally than the evidence in this case shows Mr. Kiecksee to ever have been. In Meyer v. Russell, 55 N. D. 546, 214 N. W. 857, 869, it is stated as a general rule that: "Impairment of the faculties by disease or old age will not invalidate a deed if the party executing it had sufficient mental capacity to understand his act. It must be shown that the grantor did not have sufficient mind and memory to comprehend the nature and character of the transaction. Mental weakness that does not amount to inability to comprehend and understand the nature and effect of the transaction is not sufficient to invalidate a deed." Willemin v. Dunn, 93 Ill. 511; Kimball v. Cuddy, 117 Ill. 213, 7 N. E. 589; Sears v. Vaughan, 230 Ill. 572, 82 N. E. 881; Dalbey v. Hayes, 267 Ill. 521, 108 N. E. 657.

The court made no direct finding that the execution of the deed was the result of undue influence, but did make the finding that at the time of the execution of the deed the defendant "prevailed" upon his father to execute and deliver to him the deed involved. The word prevailed has a double meaning. In this case it implies that the defendant had been engaged in a prolonged effort to secure the execution of the deed, and that he did finally succeed in persuading his father to execute it. Undue influence is defined by our statute SDC 10.0310 as follows: "(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; or (2) In taking an unfair advantage of another's weakness of mind; or (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress." Nothing in the conduct of William brings him within the provisions of this section. The evidence does not show that any effort was made by or on behalf of the defendant to secure the execution of the said deed. Indeed, there is not a scin-

tilla of evidence in the entire record to show that any solicitation by or on behalf of the defendant to execute the said deed was ever made. Defendant may have had an opportunity to have solicited the execution of the deed, but opportunity does not amount to legal proof that an effort was made to bring about a conveyance. Gillette v. McLaughlin, Executor, 44 S. D. 499, 184 N. W. 277; In re Hosmer's Estate, 47 S. D. 147, 196 N. W. 545. The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor. Blochowitz v. Blochowitz et al., 122 Neb. 385, 240 N. W. 586, 82 A.L.R. 949, and the evidence must show that the party who executed the conveyance was susceptible of undue influence, either as the result of old age, mental weakness, or both. There is no evidence in this record to show that any such condition existed. Apland et al. v. Pott, 16 S. D. 185, 92 N. W. 19. (This case is very similar to the case at bar.) Boardman v. Lorentzen, 155 Wis. 566, 145 N. W. 750, 52 L.R.A., N.S., 476; In re Swanson's Estate, 54 S. D. 42, 222 N. W. 491; Peterson v. Imbsen, 46 S. D. 540, 194 N. W. 842; Ansted v. Grieve, 57 S. D. 215, 231 N. W. 912. The fact that the grantor thought out the details of both of the transactions (the making of the will and the execution of the deed) in advance and then proceeded to carry out his determination without aid or prompting from any source is sufficient to establish the fact that he was not being influenced by anyone when he executed the conveyance.

The evidence does not show that any fiduciary relationship existed between William Kiecksee and his father and certainly it fails to disclose misuse or abuse of such relationship if it did exist.

Fritz Kiecksee is still living and was in the court room throughout the trial of this case. He was called by the plaintiff as a witness and by his examination showed that he still remembers the making of the deed and the reasons that prompted him to make it.

Dr. Albert S. Rider was called by the plaintiff to testify as to Mr. Kiecksee's competency at the time of the trial.

Dr. Rider was directed by the court to make a physical examination of Mr. Kiecksee. This he did and, after making such examination and asking him a great many questions touching his mental ability, the doctor testified that Mr. Kiecksee was in excellent physical condition for a man of his age and that his responses did not indicate to him (Dr. Rider) that Mr. Kiecksee was incompetent. This was five and a half years after the deed was executed and when Mr. Kiecksee was approximately 90 years old.

The evidence in the record greatly preponderates against the findings of fact and conclusions of law made by the court and such findings and conclusions should have been for the defendant.

The judgment appealed from is reversed.

WARREN, J., concurs.

ROBERTS, RUDOLPH, and SMITH, JJ., concur in result.