JENNIE A. GILMORE, Appellee, v. ELIZABETH GRIFFITH et al., Appellees; JENNIE L. SMITH, Intervener, Appellant.

ELIZABETH A. GRIFFITH et al., Appellees, v. FLOY GILMORE et al., Appellees; JENNIE L. SMITH, Intervener, Appellant.

**DEEDS:** Validity—Mental Incompetency—Burden of Proof. A daughter attacking, upon the ground of mental incapacity, the validity of a deed given by her father to other children, executed shortly before his death, has the burden of showing that he did not possess contractual capacity.

**DEEDS:** Validity—Mental Incapacity. To justify the setting aside, on the ground of mental incapacity, of a deed of a father to his children, executed shortly before his death, at a time when he was sick, it must be made to appear, not only that he was sick, but that his sickness produced mental disturbances, to the extent that, at the time of making the deed, he was incapable of understanding and appreciating the extent of his property, the objects of his bounty, and the disposition that he desired to make of his estate.

**DEEDS:** Validity—Mental Incapacity. Evidence reviewed, in an action in partition, where it was claimed that a grantor was mentally incapacitated to execute a deed, and held insufficient to show that, although the deeds were executed to his children while he was sick, and shortly before his death, he was irrational or mentally incompetent on the day of execution thereof.

**DEEDS:** Validity—Undue Influence. Evidence reviewed, in an action in partition, where it was claimed that deeds were executed under undue influence, and held insufficient to sustain a finding that a father, who executed the deeds to his children shortly before his death, was unduly influenced by a son, with whom he was living at the time of his death, and to whom was conveyed more land than to any of the other children.

**DEEDS:** Delivery—Essentials. There was a sufficient delivery of deeds where the father, after executing them to his children, delivered them to his lawyer, who, with the grantor's consent, delivered them to the mother, to be delivered to the children upon the father's death, and they were so delivered.

**TENANCY IN COMMON:** Ouster—Laches. Where a son took possession under a deed from his father, delivered to him upon

his father's death, his possession was adverse to a daughter, and not the possession of a tenant in common with her, and his possession was in the nature of an ouster, and called on her for some action.

*Appeal from Harrison District Court.*—J. B. ROCKAFELLOW, Judge.

OCTOBER 16, 1919.

THIS action was brought in partition. Jennie L. Smith intervened, claiming an interest in the property sought to be partitioned. Her petition was dismissed. She appeals. The opinion states the facts.—*Affirmed.*

*Wm. Kennedy, Roadifer & Roadifer, Cochran & Wolf,* and *H. L. Robertson,* for appellant.

*J. S. Dewell* and *John J. Hess,* for appellees.

GAYNOR, J.—This action is brought by the widow of one Wilder H. Gilmore, to partition certain real estate which she claims her husband owned at the time of his death. The defendants are the children of Wilder H. Gilmore. There is no controversy between the plaintiff and the defendants touching either the ownership of the property or the right to partition it, so far as this record discloses. This suit was begun on the 24th day of October, 1914, and was still pending and undetermined when Jennie L. Smith, a sister of Wilder H. Gilmore's, appeared and filed a petition of intervention, claiming that she had an interest in certain of the real estate involved in the suit, and asking that her interest be recognized and enforced in that suit. The petition of intervention was filed on the 5th day of December, and provokes the only controversy here for our consideration.

It is conceded that, on and prior to the 10th day of March, 1894, one Charles Gilmore was the owner of 1,320 acres of land, part of which is in controversy. He died on

the 22d day of March, 1894, leaving surviving him his widow, Elizabeth H. Gilmore, two sons, Charles Gilmore and Wilder H. Gilmore, and four daughters, Elinora Guerin, Alice L. Mendenhall, Rosetta Smith, and the intervener, Jennie L. Smith. On the 10th day of March, 1894, 12 days before his death, he executed certain deeds to his children: one deed of 200 acres to his son Charles; one deed of 160 acres to his son Wilder, as trustee (this deed purported to convey the title to Wilder for life, with the remainder over to the heirs of his body, reserving the use, rent, and possession to his father and mother, grantors in the deed); another deed to Wilder of 440 acres; one to Elinora Guerin of 160 acres; one to Alice L. Mendenhall of 160 acres; and one to Rosetta Smith of 200 acres. At this time, all the children were of age. After the deeds were made, they did not come into the actual physical possession of the grantees named in the deeds until after the father's death. They were recorded, however, on the 29th day of March, 1894, and were delivered soon thereafter to the grantees therein named. Each, upon receiving his deeds, entered into possession of the land described therein, and has occupied the same personally, or by grantee, ever since. The mother, Elizabeth, died in 1903. All these children are now living, except the son, Wilder. His death occurred in 1913. At the time of his death, he was, and ever since the delivery of the deeds to him has been, in possession of the land so deeded to him. The plaintiff, Jennie Gilmore, widow of Wilder, under the assumption that her husband, Wilder, owned this land at the time of his death, brought this action to partition. Jennie L. Smith, sister of Wilder, and daughter of Charles, intervened, claiming that she is entitled, as daughter and heir of her father, Charles, to share in so much of Wilder's estate as is claimed under the deeds purporting to be executed by the father to Wilder on March 10, 1894. She predicates her right on the grounds: (1)

That her father, Charles, was the owner of this land at the time of his death; that the pretended deeds made on the 10th of March, 1894, are void, because the father, at the time, was mentally incompetent to make the deeds. (2) The deeds were procured by undue influence. (3) They were never delivered. On this she predicates the claim that no title ever passed to Wilder; that the title still remained in her father, and so remained at the time of his death; and that she, as one of his heirs, is entitled now to have her right, as such heir, recognized, and her share in this real estate, so attempted to be deeded, confirmed and enforced, as against the plaintiff and her children; that the only right that Wilder ever acquired in the land was a right in common with this plaintiff and the other children, as heirs of the father.

It being conceded that Charles Gilmore, the elder, was the owner of the land in controversy on and prior to the 10th day of March, 1894, and never parted with his title except by these conveyances, and that he died intestate on the 22d day of March, 1894, it follows that, if the title did not pass to Wilder under these deeds, it passed immediately to the heirs, among whom is this intervener, Jennie L. Smith.

Before entering upon a consideration of the defenses which are urged against the intervener's claim, it is proper that we first consider the claims upon which intervener bases her right to an interest in the property. If she fails in her claim, the defenses become immaterial.

It is apparent that, if the deeds made by Charles to his children were valid, and conveyed to them the interest therein described, the intervener has no case. It will be noted that these deeds were made and delivered, and grantees went into possession, more than 20 years before any claim was made by this intervener. It will be noted that the father attempted by those deeds to divide all his real

estate among these children. It will be noted that these deeds were placed on record 20 years before this suit was begun. It will be noted that all these children to whom deeds were made took possession of the property deeded, and have ever since occupied the same, either personally or by grantee, and that, at the time these deeds were made, the father was about 75 years of age. His wife was a few years younger. His children were all grown, married, and gone from home, except the son Wilder. Wilder married, and remained at home.

The first question for our consideration is the mental condition of Charles Gilmore at the time these deeds were made. The burden is on the intervener to show that he did not possess contractual capacity. The testimony is mainly directed to his physical condition, and to a showing that he was suffering from some physical disorder at that time, and for a few weeks prior to the making of the deeds. He was under a doctor's care, and was being treated for stomach trouble. The record justifies us in saying that his trouble was purely physical, and that this produced in him physical disturbances which, at intervals, left him physically prostrated. At other times during the same sickness, though not physically well by any means, he was able to be up and about the house, conversing intelligently with those with whom he came in contact. There is no evidence of irrationality; no evidence that he possessed hallucinations; no evidence that the physical condition, reacting on his mind, had produced abnormal mental phenomena, or any disturbing influences producing irrationality. To justify the setting aside of the deeds, it must be made to appear, not only that the man was sick, but that this sickness produced mental disturbances to the extent that, at the time these deeds were made, he wa

1. DEEDS: validity: mental incompetency: burden of proof.

2. DEEDS: validity: mental incapacity.

incapable of understanding and appreciating the extent of his property, the objects of his bounty, and the disposition which he desired to make of his estate.

3. DEEDS : validity : mental incapacity.

Conceding his rationality, he evidently intended to dispose of his property to his children before his death, and this, according to his conception of the meritorious claims of each upon his bounty, and to make such disposition as was consistent with such thought and purpose. The record discloses that he was out of the house and about his premises until a few days before his death; was up and about the house until the day of his death; that he was up and dressed on the morning of the day on which he died. A few days before the deeds were made, he expressed to Dr. Coit, who was his attending physician, a wish to see an attorney, saying: "I want to fix up matters. I want, if possible, to avoid trouble." On the 10th of March, Mr. James S. Dewell, of Missouri Valley, at the request of Dr. Coit, came to the home place, met Charles, and prepared the deeds in controversy. Though Charles had complained somewhat of ill health for a year preceding his death, it seems that the immediate trouble that caused his death was not of long duration. It only became acute a few weeks before his death. There is no question that, on some of the days during the month of March, he suffered severely from pain and exhaustion. At these times, he would lie in apparent stupor, and did not care to converse with, and seemed to have but little interest in, the people with whom he came in contact, though he had known them intimately for many years. Much of the testimony comes from those children who accepted the bounty of the father under the deeds executed on the 10th day of March, and who have ever since retained what came to them under these deeds which they now claim are the product of the irrational and irresponsible conduct of their father. There are other witnesses who testify to

his physical condition, whose testimony might suggest that he was so prostrated by his sickness that his mind had totally relaxed its grasp upon all worldly matters, and that he had lost all interest in his friends, his property, and his obligations touching the same; that his physical condition and pain had produced in him such a paralysis of thought and purpose that he was incapable of holding his mind to any purpose, rational or irrational. Some testified that his physical condition had produced in him such physical -exhaustion that he was incapable of understanding or executing any purpose touching the disposition of his property. It would serve no good purpose to set out this evidence in detail. We have examined it with care, and, while we are persuaded that some of these witnesses are honest in what they say, we are also persuaded that their testimony relates to a day other than that on which the deeds were executed. No doubt there were days when the pain was so acute that it produced physical exhaustion. There is no doubt that, on certain days, his physical condition was such that he did not care to exchange even the courtesies of the day with his friends. One suffering from intense physical pain may, while the paroxysm is on, refrain from extending, and even refuse to extend, the warm hand of friendship, or to exchange the verbal courtesies of the day, and yet, when the paroxysm has passed, be physically and mentally normal and natural. We say this because this record discloses times of acute suffering, before the day on which these deeds were made. There is no doubt that some of these witnesses, after these 20 years, have confused the day on which these deeds were made with the days on which they made their observations. While there is no doubt that, at intervals, he suffered acutely, there is also no doubt that there were intervals when he did not suffer acutely, though always suffering somewhat from the effects of his stomach trouble. There were days when he

retired to his bed. There were days when he was up and dressed, moving about the house and in the yard, with his hand ready to grasp the warm hand of friendship, and with a voice readily responsive to the courtesies of the day.

The witness who, if believed, brings the strongest support to intervener's contention on the question under consideration, is Dora E. Stockwell, granddaughter of Charles and daughter of Elinora Guerin. She claims to have been at the home of Charles Sr. at the time these deeds were made, and for some time before and some time after. She left, however, before her grandfather's death. Touching the execution of the deeds, her testimony is as follows:

"I know James S. Dewell, attorney at law at Missouri Valley. I saw him at my grandfather's home about the 10th of March, 1894. I was there when he came. He didn't prepare any papers or deeds after he arrived there. No papers or deeds were made out. The deeds my grandfather was asked to sign had been made out and prepared before Mr. Dewell came. Mr. Dewell was not in the room very long. I cannot recall the exact number of minutes, but it was a very short time. Grandfather was too ill for any business transactions. They went to his bedside. Grandmother placed some pillows under him, and Mr. Dewell handed some papers to Wilder Gilmore, and he handed them to grandfather. I heard grandfather ask, once or twice, what the papers were. Wilder said, 'This is the old Rainey place;' and at another time, he said, 'This is the old Mendenhall place.' Grandfather was partly leaning on his pillow, and lay back again on the pillows until he handed him another paper, and showed him where to sign. Grandfather acted as though he was too tired, and signed without asking any questions, or reading the papers, or being told anything about them. He made the effort to sign. Nothing was said by Mr. Dewell or anyone as to what the papers were, and grandfather made no

statement as to what he wanted Mr. Dewell to do, and gave no directions as to what to do with the papers. After they were supposed to be signed, they were given to grandmother, and she got grandfather's key to his box where he kept his papers, and put the papers in the box, locked the box, and put the keys back where she got them. In a day or two after Mr. Dewell left, I heard Wilder Gilmore state to grandmother that they had forgotten to get the bill of sale in favor of grandmother. Then, when Aunt Rosetta Smith came to grandmother's, I heard her and grandmother talking about Aunt Jennie Smith. Grandmother said she had been forgotten; that they didn't give her anything; and that they would have to give her something. Then grandmother said they would give her the Buffalo Gap property. Aunt Rosetta said, 'It is worthless.' Grandmother said: 'It is good enough. It is all she will get.' Mr. Dewell was there only once, to my knowledge. I was not there when he came the second trip, on March 18th. When I left, grandfather was getting weaker, and they advised me to go home, and have mother come, as he was getting worse. She came the next day, and stayed with him until his death. He was in much the same condition that he had been for more than a week. He had a very bad spell, about a week or more before, when all the family thought he was going. He rallied a little, but continued low to the end. His condition was about the same on March 10th as it was at the time I left. Grandfather seemed in a stupor most of the time, and when roused up, seemed to feel too bad to talk, or pay any attention to anyone. He seemed to recognize those that had been around him all the while, but not those who came in the house to see him. He paid no attention whatever to his business affairs, and said nothing about them. Grandmother and Wilder had full charge of his business affairs in every way. Dr. Coit was there when grandfather had such a bad spell,

just a day or two before Mr. Dewell was there, the first time. Dr. Coit said to grandmother and Wilder that grandfather was not liable to last much longer. Grandmother was much worried, and I heard her and Wilder talking privately. All I could hear was something about getting Mr. Dewell to fix up the papers. Grandmother said grandfather was not able, and he would have to attend to it. They sent for Aunt Rose Smith. She came. Grandmother told us that she was going to get grandfather a linen shirt; that she thought it was best to be prepared: and the next day, grandmother went to Mondamin, Iowa, to get it. Uncle Wilder Gilmore never missed an opportunity to say unkind things about his sisters and brothers, and did everything he could to keep grandmother and grandfather unfriendly with them; and if any of them came there to visit, he would tell grandmother they were coming around to see what they could get, in money or property. He never spoke of Aunt Jennie or her husband without using profanity, and said she should never come there, or inherit a dollar of grandfather's property if he could help it. At one time, when grandfather was sick, and they sent for my mother, Wilder was very angry, and used profane language against her because she tried to get grandfather and grandmother on friendly terms with Aunt Jennie, and because she tried to get them to give their consent to let her send for her when she lived in Sioux City. All that I ever knew Aunt Jennie to do against her parents' wishes was to marry after they forbade her to do so, because grandfather thought she was too young, and he did not approve of the man she intended to marry; but I am sure grandfather forgave her, because I heard him say, at one time, when she lived in Sioux City, that he would give her the property he owned there, so she would always have a home, because he thought her husband was a poor provider. Wilder was lazy and shiftless, and could not be

relied upon. He would not work if he could get out of it. He was always abusive and brutal, and a constant worry and annoyance to grandfather. He was no help to him whatever. Grandfather told me one day, when he found a hog killed, that Wilder killed and destroyed more than one man can earn. He and his family lived with grand-father, and were supported by him as long as he lived. After grandfather's death, they continued to live with grandmother, and she worked and sewed and clothed and looked after them all, as long as she was able to do any-thing, and they continued to use whatever she had, until her death. Uncle Wilder continued to be as worthless as before his father's death, and would do nothing to keep up the place. I saw Dr. Coit at grandfather's house two or three days, during the period just prior to his death. Grandfather's condition, at the time I left, was very bad. He had been in that condition mentally and physically for ten days or two weeks prior to the time I left. He would simply lie in a stupor most of the time."

On cross-examination, she testified:

"I heard a part of a conversation between Uncle Wilder and grandmother just a few days before Mr. Dewell came, about getting the deeds signed by grandfather. I over-heard part of the conversation. The conversation com-menced in the house, and then, apparently for fear some-one would overhear them, they went outdoors, and had an-other conversation. I heard enough of the conversation to know that they were talking about grandfather's property, and what Uncle Wilder should get, and getting deeds made, —deeds from grandfather. Finally, after the extreme bad spell that grandfather had, about a week or ten days be-fore I left there, I heard Wilder say to grandmother that he was not going to put things off any longer; that he was going to Missouri Valley and have the deeds and bill of sale, and have Mr. Dewell come, and they would have

grandfather sign them. What he proposed to grandmother was that she could have grandfather's money, and he would take the land, and she was to help him get the matter through. He said grandfather would do whatever they asked him to do, and they could put it off no longer, because grandfather was liable to pass away at any time. The next morning after this conversation, Uncle Wilder left home with my Uncle Charles, saying that they were going to Missouri Valley. He returned home in the evening. Mr. Dewell came to grandfather's the next day, bringing the deeds for grandfather to sign. He and Wilder came together. The deeds were all ready for signature. All they did was to sort them. Grandfather, at the time, didn't give any direction or make any statements to Mr. Dewell or anyone there as to what he desired, or as to what he wanted done concerning the making of deeds or bill of sale or any other papers. He made no statements at all, and nothing was said to him about deeds or any other papers, by Mr. Dewell or anyone there. He did simply what they asked him to do, without trying to read them, and they were not read to him. Grandfather said nothing at all as to what he wanted done with the papers he had signed. He didn't seem to care, or show any interest in anything. I was there during all the time Mr. Dewell was there, and was in a position to see and hear all that was done. I am sure that, if Mr. Dewell had made out any papers or deeds at that time, I could have seen him do so."

No reputable lawyer would do what this witness says Mr. Dewell did. If we take her testimony, we have this suggested: Mr. Dewell, at the instance of the one most beneficially interested in what was to be done, and without consulting the one most injuriously to be affected, prepared these deeds, disposing of 1,320 acres of land, and then, at the request of his party, came to the old man's farm, armed with these instruments, prepared under cir-

cumstances that would suggest to any lawyer that what-
ever was done with the instruments thereafter should not
be done without the knowledge, consent, and intelligent
acquiescence of the party to be affected. We must further
find, if we take her testimony as true, that Mr. Dewell,
without informing the old, gentleman of the contents of the
papers, without reading them to him, and without having
them read to him, knowing that he did not know their con-
tents, allowed him to sign them, and then, as notary public,
certified that the signing was his voluntary act. We must
further find that, after taking the signature, he took pos-
session of the papers for the use and benefit of the grantees
therein named, to be delivered to them after the old man
was dead, knowing that he was physically and mentally
incompetent. This story is too extraordinary, too unnat-
ural, too much out of harmony with all experience, to re-
ceive credence at our hands. No reputable lawyer would
have done what this girl claims Mr. Dewell did, and her
testimony on this point is not believable. There is nothing
in this record even to suggest or create a suspicion in the
mind that Mr. Dewell had any interest in the transaction
had on the 10th day of March. If Mr. Dewell did what this
girl says he did, he did an exceedingly unusual, unnatural,
and censurable act. Dr. Coit, who attended Mr. Gilmore
during his sickness, and practically up to the time of his
death, testifies that the old gentleman requested him to
send a lawyer, and only a reputable lawyer, as he desired
to transact some business that required a lawyer; that, on
this suggestion, Dr. Coit communicated with Mr. Dewell.
Mr. Dewell testifies that it was at the suggestion of Dr. Coit
that he went to Mr. Gilmore's place; that he knew nothing
of the character of the business that he was to transact
there; and that he prepared no instruments before going
there. There is no evidence that anyone except the doctor
communicated with Mr. Dewell, before his arrival at the

Gilmore home. There is no evidence that Mr. Dewell had any knowledge of the purpose for which he was summoned. However, we are requested to infer that Wilder Gilmore visited Mr. Dewell, and had the papers prepared under his direction. Mr. Dewell testifies:

"I live in Missouri Valley; have lived there 33 years; am engaged in the practice of law, and was so engaged in March, 1894. During that month, I went to the home of Charles Gilmore. I went there at the suggestion of Dr. Coit. Prior to that time, no one had spoken to me about going there. I went on the train. I met Charles Gilmore at home that day. He was in the front room of the house. He was sitting in a chair, dressed in his ordinary clothing. No one employed me to do the work that I did there that day, except Charles Gilmore. I went to the door, and, after being admitted, spoke to Mr. Gilmore. I said I had come on the suggestion of Dr. Coit, and he informed me that he wanted to see me, or someone, in order to transact some business. I had no extensive acquaintance with Mr. Gilmore before that. I simply knew who he was. He said, in substance, that he wanted to fix up some matters, and would like to make some arrangements to dispose of his property, and had made up his mind what he wanted to do, and he wanted some papers drawn up. I asked him what he wanted to do, and he gave me an outline of what he wanted done. He told me he wanted to dispose of his property, or arrange to dispose of it, among his children, and didn't care to make a will. He said he had made up his mind to deed it to them. I asked him if he had in mind the description of the land, and what he wanted to do. I asked him the names of the members of his family to whom he wanted deeds made, all of which he gave me, in the course of the transaction. He also said he had some personal property that he wanted to dispose of, and we had quite a long talk. I was there about five hours that day.

I was not acquainted with the extent of Mr. Gilmore's estate. I asked him if he could get me the legal description of the land. He said he could. I told him that, if he would tell me what he wanted to deed to the different members of the family, I would take it down. I was not acquainted with the names of all the children. He gave me the description of the different tracts he wanted deeded to the different ones. I made a memorandum of it as he gave it to me, and when we got through, I said: 'Is that all of the land you have?' He made some remark that there was some little tract he might have some interest in that wasn't worth bothering about. I never knew what he referred to. Then I read him the memorandum I had made, and I asked him if that was correct, and what he wanted deeded, and he said it was. I prepared the deeds in accordance with his direction, describing the land as he gave it to me, in preparing deeds for the different children. There was a little table in the room. I sat on one side of that, and he sat across the table in his chair, and I used that as a writing table. He gave me the numbers and description of the land, and I took it down in that way. After the deeds were prepared, they were all signed by Mr. and Mrs. Gilmore. Mrs. Gilmore was in the room a little while, after I first went there, but she didn't stay there much of the time. After the deeds were all prepared, Mrs. Gilmore was called back into the room, and the several deeds and some other papers were read over to her in the presence of Mr. Gilmore. During the work, I asked him to give me the names of all his children, and he named over a number of them; and I said, 'Is that all of them?' and he spoke and said he had a daughter, Jennie Smith; and I said, 'What about her?' and he said, 'I will not give her anything.' He said, 'It wouldn't be worth while, for one thing;' that he didn't think it would do any good to give it. Her husband was practically no account. She had married against his

will, and he didn't feel under obligation to give her any-
thing. I had my notarial seal with me, and I affixed it at
the time. He spoke to me about filing them for record
right away. I told him I didn't think it made any dif-
ference. He could record them if he wanted to, or deliver
them to the parties, or deliver them to some third person,
to be delivered to the parties. After Mr. and Mrs. Gilmore
signed the deeds, I said, 'Now, what do you want to do? re-
ferring to whether he wanted them put on record, or what
he wanted to do with them; and he said, 'Can't you take
them and turn them over to the parties?' He wanted them
turned over when he was dead. I said, 'Yes, I can, if you
want me to.' 'Well,' he says, 'You better do that.' So I
had them all in a kind of bundle there; then I made the
remark: 'I don't know whether it is necessary for me to
carry these home. You have delivered them to me. I can
deliver them to someone else. Some of the children will be
at home, if you should die soon, and you know where they
are, and it might be just as well to record some of them.
They will have to send them back for record.' So I said,
'Mrs. Gilmore, I can turn them over to you, and you will
know where the children are, and you can turn them over,
when the time comes;' and I did that. After they were
signed, I had them on the table. He first told me to keep
them; but it was at my suggestion that I didn't take them
home. I asked him if it would be just as well for me to
turn them over to Mrs. Gilmore and let her keep them;
that she could turn them over. All that he said that day
was not only rational, but very intelligent. I would say
that he was very bright. I was there again after that, at
the suggestion of Dr. Coit, to prepare some further papers.
Mr. Gilmore was in the front room, sitting or lying on a
bed. He was dressed in his ordinary clothing. I talked
with him. He recognized me, when I came in. I told him
I understood from Dr. Coit that he wanted to see me again,

and I said, 'Well, what is it you want?' and he said, in substance, that he wanted to talk a little more about some business; that he wanted me to make some additional papers; that he concluded to deed the Buffalo Gap property to Jennie, and he wanted to talk something about the home place, and he said he would make some little further arrangements about the cattle. I noticed then that he was somewhat weaker then than he was on the former occasion. I sat down by the bed, and told him, 'If you will tell me what you want, I will try and take note of it, and fix what you want.' He then told me further that he had concluded to deed this Buffalo Gap property to Jennie, and he wanted to make a deed for it; and he also said that he wanted to talk a little with me, and have me fix some papers about the cattle, and he wanted to talk a little further about the 'homestead,' as he called it. He started to get the deed to the Buffalo Gap property, but Mrs. Gilmore anticipated, and got it for him; and a quitclaim deed was accordingly prepared to Jennie Smith, the intervener. During the same time, I prepared a bill of sale. At the first trip, I prepared a bill of sale of some of the personal property to Wilder, at which time he spoke about the fat cattle, and that possibly they might be disposed of soon. This time, he concluded that they better fix that part of the cattle, so far as Mrs. Gilmore was concerned, and he wanted me to fix that, and I prepared this bill of sale for that purpose. This bill of sale conveyed a half interest to Wilder and a half interest to the mother. He seemed to be anxious that Mrs. Gilmore should have the use of the home place during her life; so I wrote out a lease along the line suggested."

This brings us to a consideration of the second ground urged by the plaintiff for holding the deeds invalid. She claims they were procured by undue influence exercised on

the old man, and operating at the time of the making of the deeds.

**4. DEEDS: valid-ity: undue in-fluence.**

We fail to find sufficient evidence in the record justifying us in so finding. We find no substantial evidence of the exercise of influence that, operating on the mind of Mr. Gilmore, tended to induce his action. We are left purely to speculation, and not to proof of substantive facts. Under the circumstances which this record discloses, the disposition was not unreasonable, nor does it give evidence even of an irrational mind, or of a mind not acting freely and impartially. We think the intervener cannot be sustained in this contention.

The third contention is that the deeds were not delivered, and, therefore, became ineffectual as conveyances.

This is purely a fact question, and the record discloses that, after the deeds were executed, they were delivered to Mr. Dewell by the grantor named in the deeds; that he took them into his possession, and, with the old man's consent, delivered them to the wife, to be delivered to the children

**5. DEEDS: deliv-ery: essentials.**

upon his death; that, soon after his death, they were recorded, and then delivered to the grantees named therein. That this is sufficient delivery, see *Lippold v. Lippold,* 112 Iowa 134; *Newton and Seeley v. Bealer,* 41 Iowa 334; *Griswell v. Griswell,* 138 Iowa 607; *Kneeland v. Cowperthwaite,* 138 Iowa 193; *Saunders v. Saunders,* 115 Iowa 275, 276.

However that may be, intervention is, in its nature, an action to recover an interest in real estate. It was not brought within the statutory period. Whatever claim she may have had, if prosecuted diligently, she has lost by the lapse of time. It is idle for her to claim that she did not know the disposition made by her father of this property.

**6. TENANCY IN COMMON · oust-er: laches.**

ty. She certainly knew it soon after his death. The deeds were all placed on record. These parties went into posses-

sion of the properties deeded, and have ever since occupied the same under color of title and claim of right. Her claim that she was a tenant in common, and that, therefore, the possession was not adverse, has no support in this record. When the grantees took possession of this property, under the deeds, it was in the nature of an ouster, and called on her for some action, if she claimed what she is now asserting. She has slept on whatever right she had for 20 years, knowing that the parties against whom she asserts her rights were claiming and occupying the property under deeds from the common ancestor, executed before his death. We need cite no authorities in support of this position.

Upon the whole record, we think the court was right in dismissing intervener's petition, and its action is—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.