ALBERT J. BLOCHOWITZ ET AL., APPELLEES, V. FRANK J.
BLOCHOWITZ ET AL., APPELLANTS.

FILED JANUARY 29, 1932. No. 27915.

*Mockett & Finkelstein, Thomas J. Dredla* and *Roy B. Ford,* for appellants.

*John J. Ledwith* and *Hall, Cline & Williams, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This is a proceeding in equity to cancel four warranty deeds which the amended petition charges "were executed on April 4, 1929," by Joseph Blochowitz when he "was eighty-five years of age, and because of his extreme age and the condition of his health he was mentally incompetent to execute such conveyances;" as to which it is further alleged that they "were procured by fraud and undue influence, practiced by the defendants John A. Blochowitz, Frank J. Blochowitz and George Blochowitz * * * and * * * were never delivered." The plaintiffs are Albert J. Blochowitz, Lena M. Yankton, and Anna Geistlinger, who are respectively the brother and sisters of the defendants named above. Rosalia Blochowitz, widow of Joseph Blochowitz, who is the mother of all of the other parties to this litigation, is also made a party defendant. She joined with her husband in the execution of the four conveyances in suit, but, as to her, the pleadings make no charge of participation in fraud or in the exercise of undue influence; neither is her competency challenged, nor is it alleged that she was in any manner deceived or defrauded in the transaction, or that she was the subject of undue influence. The allegations of the amended petition were traversed by appropriate pleadings, and upon the issues thus formed a trial was had, which resulted in a decree

for the plaintiffs. Motions for new trial were filed by defendants, which were by the court overruled. Defendants appeal.

This court is now, by statute, to determine the issues *de novo* from the six volume record before us.

The consideration of the disputed evidence must be made in the light of the following facts: Joseph Blochowitz and his wife, Rosalia, were natives of Poland, but of German stock. They migrated to the United States in the year 1880, and purchased a quarter section of land in Lancaster county in January, 1884, on which they thereafter made their home. To them seven children were born, one of whom died in infancy, and six of whom were living at the time of the death of the father on February 20, 1930. There is no dispute in the evidence that life in this family was a life of unremitting service and toil. From the age of thirteen years the sons were required to carry on as men. The labors were incessant, the hours were long, entertainment and relaxation were unknown, with frugal fare and meager compensation. All parties concede that for many years, even after the sons attained their respective majorities, the father received and appropriated the fruits of the common toil, managed and controlled it as his own property, and ruled his household like the patriarchs of old, with a conceded power and supremacy unchallenged by its membership.

Reference in the briefs is made to the fact that the savings of Joseph Blochowitz and his wife, accumulated during the seventeen years after the purchase of their Lancaster county home, were unwisely loaned to the proprietor of a lumber yard at Crete, Nebraska, resulting in a total loss. So, after this incident, about the year 1898, the Blochowitz family continued their toil in pursuit of a fortune. In the meantime, in March, 1894, an additional eighty-acre tract had been acquired by the father. Thereafter further purchases of real estate were made by him until in July, 1904, when he bought the S. E. ¼ of section 14, township 8, range 5, he had become the owner of 640

acres of land, all situated in the immediate vicinity of the home place, and most of it thereto adjoining. The record indicates that the real estate was all paid for prior to 1910. In 1901 Lena Blochowitz, then eighteen years old, was married to Theodor Yankton, and in the same year her sister, Anna Blochowitz, then fifteen years of age, was married to Mathias Geistlinger, and both daughters thereafter removed to new homes with their husbands, and thereafter ceased to labor under the father's direction or for the benefit of his family. In 1903, according to the record in this case, the earliest will of Joseph Blochowitz was executed. It bears date September 4, 1903, is in due form, and by its terms Lena Yankton and Anna Geistlinger are to receive the sum of $100 each; Frank and John Blochowitz are each devised a quarter section of land, and Albert and George are each to receive eighty-acre tracts. In November, 1906, Lena Yankton is paid $1,000 cash by her father, which is receipted for, "as inheritance from Joseph Blochowitz and wife." In this connection it may be said that on January 26, 1920, Anna Geistlinger is paid a like amount by her father, and an identical receipt executed by her. On the 10th day of April, 1907, Joseph Blochowitz executed the second will, which is also in due form. By the terms of this instrument Lena Yankton and Anna Geistlinger are to receive legacies in the sum of $100 each, Frank and John Blochowitz are each devised 160 acres of land, to Albert is devised 80 acres, and a like amount is given his brother George. Rosalia Blochowitz is named as residuary legatee, and "all former wills and codicils by me made" are revoked. On the 10th day of October, 1910, another will was executed by Joseph Blochowitz. It is in due form; expressly revokes "all former wills by me made," bequeaths to Lena Yankton and Anna Geistlinger the sum of $100 each, and devises to Frank Blochowitz the S. E. 1/4 of section 14; to John Blochowitz the S. 1/2 of the S. E. 1/4 and the E. 1/2 of the S. W. 1/4, all in section 11; to Albert Blochowitz the N. E. 1/4 of section 14; to George Blochowitz the E. 1/2 of the N. W.

¼ of section 14, and the N. ½ of the N. E. ¼ of section 11, all in township 8, range 5, East of the 6th P. M.

In 1913 Frank J. Blochowitz and immediate family, by direction of his father, moved upon the S. E. ¼ of section 14, and thereafter improved, farmed and continued to reside thereon, the record title thereto continuing in the father. On April 4, 1929, Joseph Blochowitz and his wife executed four warranty deeds, each in due form, which purport to convey the following Lancaster county lands: To Frank J. Blochowitz the S. E. ¼ of section 14, reserving the payment of $600 to be made annually by grantee to grantors during their lifetime; to John Blochowitz the N. E. ¼ of section 14, reserving a $400 annual payment to be made by grantee to grantors during their lifetime; to Albert Blochowitz the N. ½ of the N. E. ¼ of section 11, reserving payment of $400 annually to grantors by grantee during lifetime of grantors; to George Blochowitz the E. ½ of the S. W. ¼ and the S. ½ of the S. E. ¼; all in section 11, also the E. ½ of the N. W. ¼ of section 14, reserving annual payment of $800 to be made by grantee to grantors during their lifetime, and also the reservation of two rooms in the premises by grantors during their lifetime. On April 4, 1929, after having signed and acknowledged the above conveyances, Joseph Blochowitz also executed a last will and testament. This instrument, in due and usual form, bequeaths to Anna Geistlinger and Lena Yankton the sum of $500 each, declares: "All of my four sons, Frank J., John, Albert, and George, are entitled to no further part of inheritance as all each and every one of them have received all that they are entitled to," revokes all former wills, but contains no residuary clause.

"Execution" of the four instruments in suit being admitted by the pleadings, the determination of the disputed question of their legal delivery is logically first for decision.

The testimony of George A. Hagensick, a witness called by, and testifying for, plaintiffs on this subject, is that

the four deeds in suit had been executed in his office on the 4th day of April, 1929, by Joseph Blochowitz and his wife. On the same day, after the drafting, signing and acknowledging of the deeds, Blochowitz had also executed his last will and testament, which it may now be said has been duly admitted to probate. Witness testifies that after this work had been completed he informed the Blochowitzes that, "if those deeds were not recorded, they should be turned in the hands of a third party." Mr. Blochowitz thereupon turned over the four deeds and his will, which were then contained in an unsealed envelope, to his wife, saying, "You keep those papers for the boys and girls." Mrs. Rosalia Blochowitz, also called as a witness on behalf of plaintiffs, in her testimony thus elicited fully corroborates the statements of witness Hagensick, and it cannot be denied that at the conclusion of this transaction she received and thereafter kept "for the boys" the deeds in question after the death of her husband until they were by her turned over to her son, Frank J. Blochowitz, and pursuant to her directions recorded.

Appellees challenge the legal sufficiency of these facts to sustain a delivery. In support of their position they cite the following from 1 Devlin on Deeds, 382: "There is no delivery of a deed made by a husband and wife to their children, where it is placed by the husband in the hands of the wife (who is one of the grantors) for safe keeping, and is retained in their possession and control." It would seem obvious that the facts contemplated by this language are not the facts involved in the instant case. The sole authority cited by the author in support of the text quoted is *Morris v. Caudle*, 178 Ill. 9. But the true application of the principle announced in the text and decision referred to is disclosed in the following quoted from the opinion in *Morris v. Caudle, supra:* "After the deed was executed, the grantor, Caudle, took it home with him and then handed it to his wife, and it was kept in the house where he and his wife resided, under his control,

until the last of July, 1885, when the wife sent it to the county seat to be recorded. If, upon the execution of the deed, Caudle had delivered it to his wife to be by her held for the grantees therein named, we would not hesitate to hold that the instrument was delivered."

A careful reading of *Joslin v. Goddard*, 187 Mass. 165, *Gaines v. Keener*, 48 W. Va. 56, and *Meador v. Ward*, 303 Mo. 176, also cited by appellees, is convincing that they are wholly inapplicable to the facts of the instant case. Indeed, the case last cited is in principle wholly opposed to appellees' contention.

The true rule appears to be that it is not essential to the validity of the deed that it should be delivered to the grantee personally. It is sufficient if the grantor delivers it to a third person unconditionally for the use of the grantee, the grantor reserving no control over the instrument. *Roepke v. Nutzmann*, 95 Neb. 589; *Johnson v. Becker*, 251 Mich. 132; *Sneathen v. Sneathen*, 104 Mo. 201; *Kittoe v. Willey*, 121 Wis. 548; *Gilmore v. Griffith*, 187 Ia. 327; *Hill v. Naylor*, 99 Neb. 791. In Nebraska the conveyance of real estate and the delivery of deeds conveying the same may be made direct by husband to wife. *Lavigne v. Tobin*, 52 Neb. 686; *Currier v. Teske*, 84 Neb. 60; *Furrow v. Athey*, 21 Neb. 671. And the wife of the grantor may be such "third person," to whom lawful delivery may be made by the husband for the use and benefit of their children. *Sneathen v. Sneathen*, 104 Mo. 201; *Kittoe v. Willey*, 121 Wis. 548; *Gilmore v. Griffith*, 187 Ia. 327; *Stout v. Rayl*, 146 Ind. 379.

However, appellees further contend that the probative force of the evidence of Hagensick and Rosalia Blochowitz on the subject of the delivery of the deeds is largely, if not wholly, destroyed because of the fact that as to certain details their evidence in the present case is wholly at variance with evidence given by them in certain depositions prior to the present trial. It may be said that there was a case pending in the county court of Lancaster county involving the probate of the will drawn at the time of the

execution of these deeds in suit. In this proceeding the parties in the instant case were also parties thereto. It also appears that the plaintiffs in the instant case procured the deposition of Hagensick to be taken, in which it is claimed in response to interrogatories he testified as follows, as to the delivery of the deeds in suit (after detailing the drafting and execution of the deeds and will) : "Then I took the papers that were left there, the deeds and the will, and put them in an envelope and handed them to Mr. Blochowitz, and he said, 'No, give them to the Mrs.,' and (when he handed them over to her) he said, 'You take care of these.' " And to the question propounded to him, "Is that all he said?" this witness answered, "Yes." There are other answers in this deposition of similar tenor. But it also appears that after the taking of this deposition Hagensick was called as a witness in the probate proceeding then pending in the county court of Lancaster county, and to which the parties to this instant case were also parties. In that proceeding he testified as follows: "Q. Now, do you think of anything further, Mr. Hagensick, that was done there that afternoon in the making of this instrument? We just want to get everything that happened you know. Have you told the court everything that was said, and everything that was done there after the instrument was signed? A. I had the deeds and I took the deeds and this will and put them in an envelope and told Mr. Blochowitz, if these deeds are not delivered to the boys, they should be placed in the hands of a third party. I handed them to Mr. Blochowitz, and he, in turn, handed that envelope to Mrs. Blochowitz, who was sitting to the right side of him, and he said, 'Here are these papers. Take care of them for the boys and girls.' "

To the instant case Hagensick is not a party. So far as disclosed by the record he has no financial interest therein. He was called as a witness by plaintiffs, and examined in their behalf concerning the delivery of the deeds in suit by Blochowitz to his wife. His testimony was in all respects a substantial reiteration of the testimony given by

him in the county court. He was called and examined by plaintiffs as their witness with full knowledge of what that evidence had been. Thereafter upon the basis of, and with reference to, the first deposition, over objection, he was in effect cross-examined in a manner appropriate to impeachment, and the statements in such deposition on the subject of delivery of the deeds were, over objection, read to the witness in the presence of the court and thus in effect received in evidence as contradicting the statements then testified to by him. In this the trial court erred. The controlling rule applicable to the situation is: "Where one has been misled or entrapped into calling a witness by reason of such witness, previous to the trial, having made statements to the party, or his counsel, favorable to the party's contention, and at variance with the testimony given at the trial, and the party believed and relied upon such statements in calling the witness, and is surprised by the testimony on a material point, he may, in the discretion of the court, be permitted to show the contradictory statements made before the trial." *Penhansky v. Drake Realty Construction Co.*, 109 Neb. 120. But in the instant case the plaintiffs, in the light of the facts fully known to them when they called this witness to the stand during the trial here under review, could not have been "misled" or "entrapped" by the statements appearing in the first deposition, in view of his subsequent testimony in the county court. It is incredible that they, then, in any manner relied thereon or were deceived by the testimony in this case actually given, and that they were actually "surprised" thereby is a conclusion wholly unsupported by the record and inconsistent with common sense. The prerequisites to invoking the application of the rule quoted were wholly absent, and the trial court therefore, it is considered, erred in failing to sustain objections seasonably made to this line of examination pursued by plaintiffs, who are in turn under the facts in this case bound by the evidence elicited by them, otherwise uncontradicted, unmodified by the evidence thus erroneously received.

It also follows that, giving full force and effect to the competent evidence before us, we are required to hold that a legal and effective delivery of the four deeds has been established by a clear preponderance of the evidence.

We have carefully read and considered the testimony of this record as to the mental capacity of the grantor on the date the deeds were executed. The testimony on this branch of the case covers a great many pages, and it would be impossible to give even a fair summary of it without extending this opinion to unwarranted length. The plaintiffs having alleged the incapacity of the grantor to make the deeds, the burden was upon them to establish such fact. This they have not done. Our conclusion of the record upon this phase of the case is that it falls far short of adequate proof of lack of mental capacity to make the deeds. The rule of law is well settled that, to set aside a deed on the ground of want of mental capacity on the part of the grantor, it must be clearly established that the mind of the grantor was so weak or unbalanced at the time of the execution of the deed that he would not understand and comprehend the purport and effect of what he was then doing. *Clark v. Holmes,* 109 Neb. 213; *Schley v. Horan,* 82 Neb. 704; *West v. West,* 84 Neb. 169.

The transactions evidenced by these warranty deeds are also challenged by appellees as being the fruits of fraud and undue influence. It is true that the parties involved are father and sons; that their mutual business transactions were continuous, close, confidential, and involved. Conceding for the moment only that the relations disclosed were of such a character, when taken in connection with the facts by plaintiffs claimed to exist, as to raise an inference or presumption of a present undue influence, or even a present constructive fraud, still the ultimate controlling principle is: "The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor. The affection, confidence and gratitude of a parent to a child which inspires the gift is a natural and lawful influence, and will not render

it voidable, unless this influence has been so used as to confuse the judgment and control the will of the donor." *Hacker v. Hoover*, 89 Neb. 317; *Brugman v. Brugman*, 93 Neb. 408; *Little v. Curson*, 114 Neb. 752.

According to the theory of plaintiffs, as outlined in their briefs, and to some extent presented in argument, the will of the donor was by unlawful and fraudulent influence controlled in the instant case; that prior to the induction of Albert J. Blochowitz into the United States military service in 1917, while the father was mentally competent, he, the father, transacted his own business, and all of the property was in his own name. In addition to 640 acres of land in Lancaster county, and a South Dakota farm, he at that time had also acquired, and then owned, mortgages and bonds to the extent of $100,000, or "a little better, which were kept in a tin bucket in father's and mother's bed room;" that "before the war (when Albert was 16 or 17 years old) Albert was told by Joseph (his father) that each son was to get a quarter section of land," and there was to be an equal division of the bonds and mortgages. When Albert got back from the army in 1919, "He found that he was outside the family circle. Things were different." The father acted "kind of sore;" that the father's business was then largely transacted by the defendant sons, a condition which thereafter progressively continuously increased; that advancing age weakened and impaired the father's mental faculties and judgment; that the defendant sons, taking advantage of the situation and especially of the confidential relations existing, succeeded in poisoning the mind of the aged father against the absent soldier son, and, as the fruits of the exercise of this undue influence, had on numerous and various occasions between the departure of Albert for the army and the death of the father in February, 1930, not only obtained the conveyances of April 4, 1929, in suit in this case, but secured for themselves that which in the end resulted in the acquirement of substantially all personal property owned by the father in his life, to the exclusion of plaintiffs herein.

It must be kept in mind, however, that in the instant case the issues framed by the pleadings relate exclusively to the real estate. The cancelation of the deeds in suit is substantially the sole relief sought by the plaintiffs.

At the trial of these issues in this case the defendants were called by plaintiffs as their witnesses. There is oral evidence given by the defendants, while testifying as plaintiffs' witnesses, which, if believed, fairly established that the execution of the warranty deeds in suit was solely due to the gratitude, affection and confidence of the grantors thereof to and in the several grantees named therein, and was made pursuant to a substantially constant and abiding scheme of the father for the distribution of his property; and which fully negatives the idea that any undue influence by or on the part of such grantees had been used "to confuse the will or control the judgment" of the grantors, and which also expressly negatives the use by the defendant sons with the father of any influence adverse to the plaintiffs or any of them.

Opposed to this the plaintiffs appeal to the record, which discloses that upon the commencement of proceedings in the county court of Lancaster county to probate the will of April 4, 1929, and after the commencement of the present action to cancel and annul the warranty deeds of that date, and notwithstanding the defendants were lifetime residents of Lancaster county, and at all times subject to the commands of process issued from its courts, the plaintiffs proceeded to take the depositions of the defendants, evidently for a purpose not embraced in the express words of our controlling statute. Later in the probate proceedings in the county court of Lancaster county the defendants were again called and testified as plaintiffs' witnesses. Still later on the trial of the instant case in the district court for Lancaster county the defendants were by plaintiffs called as their witnesses, and as such testified. On each of these three occasions the scope of the evidence covered appears to have been substantially the same. In addition, by the use of leading questions, accorded counsel

for the plaintiffs by the trial court in making their case in chief, these defendants, as plaintiffs' witnesses on this third occasion, were in fact, if not in form, subjected to a comprehensive cross-examination, which covered not only their then testimony, but embraced as well the statements contained in the prior depositions and the evidence given by them in the county court. Plaintiffs further insist that this evidence establishes an admitted relation of trust and confidence between the grantors and grantees at the time of the execution of the deeds. Admitting that defendants, having been called and testified as plaintiffs' witnesses, may not be impeached, plaintiffs now insist, however, that these witnesses, due to conflicting statements testified to by them on these respective occasions, stand so discredited as to deprive their evidence of its probative force and effect, and that therefore the burden of evidence imposed upon them by the existence of relations of trust and confidence with grantors has not been sustained. However, the rule appears to be: "Even though a witness is shown to have testified falsely in some respects, his testimony as to other matters concerning which he is corroborated by evidence of a credible nature should be considered, and may be believed." 40 Cyc. 2590.

There is no controversy as to the situation in the Blochowitz home prior to the World War, and that competency of the father at the commencement thereof is unchallenged, and the existence of fraud or undue influence therein is not charged.

In this situation, "The law, founded on a full knowledge and just appreciation of the general course of human affairs, indulges a strong presumption against any sudden change in the moral as well as the mental and social condition of man. When the existence of a person, a personal relation or a state of things is once established by proof, the law presumes that the person, relation or state of things continues to exist as before till the contrary is shown, or till a different presumption is raised from the nature of the subject in question." Lawson, Law of Pre-

sumptive Evidence (2d ed.) 229. See, also, 1 Moore on Facts, 517.

Upon this as an ultimate basis courts have almost uniformly adopted the conclusion that, where the issue is undue influence and testamentary incapacity, admission in evidence of former wills as tending to prove that the contested will, or other form of conveyance, was in substantial conformity with the testator's former expressed purpose, made at a time when his competency is unchallenged and the existence of undue influence is not charged, is approved. *Bowers v. Kutzleb,* 149 Md. 308; *Lindsey v. Stephens,* 229 Mo. 600; *Whisner v. Whisner,* 122 Md. 195; *Kerr v. Lunsford,* 31 W. Va. 659; *Hughes v. Hughes' Executor,* 31 Ala. 519; *Thornton's Exrs. v. Thornton's Heirs,* 39 Vt. 122; *Ross v. McQuiston,* 45 Ia. 145; *Payne v. Payne,* 97 W. Va. 627; *Barlow v. Waters,* 16 Ky. Law Rep. 426; *Love v. Johnston,* 34 N. Car. 355; *Sanger v. Bacon,* 180 Ind. 322; *Nieman v. Schnitker,* 181 Ill. 400; *Thompson v. Ish,* 99 Mo. 160.

An examination of the above cases discloses that, while some jurisdictions on the issue of undue influence hold as inadmissible the contents of a former will in support of a contestant, "where the terms of such will are variant from the will in suit" (*McCune v. Reynolds,* 288 Ill. 188), yet all the cases above cited are in agreement that, "In a will contest case the proponents may introduce a prior will executed when the testator's testamentary capacity was not questioned and which conforms substantially to the instrument contested, for the purpose of refuting charges of undue influence or want of testamentary capacity by showing that the testator had a constant and abiding scheme for the distribution of his property." *Pollock v. Pollock,* 328 Ill. 179.

True, in the instant case the final instrumentalities of conveyance made use of were warranty deeds, and not testamentary in character. But the vital questions remain the same. Then, too, in the recent case of *Holtman v. Lallman, ante,* p. 183, where the controlling questions

were, as here, the validity of a warranty deed and of certain gifts of personal property, attacked on the ground of undue influence and mental incapacity, and the district court admitted in evidence the provisions of a prior will of grantor, the discussion of the effect thereof, in the opinion of this court, by fair implication approves the action of the trial court.

It is to be noted that the wills of the decedent executed by him in 1903, 1907, and 1910, respectively, offered by the contestees, among other purposes, for showing his continuity of mind, were received in evidence without objection; their authenticity is unquestioned, and they are regular and in usual form. The formality of the execution of these instruments is not an issue in this case, and the testimony of the attesting witnesses thereto is unnecessary and immaterial. *Sanger v. Bacon,* 180 Ind. 322. Each of these wills, now in evidence as valid instruments, in view of the admitted facts before us, must be taken not only to establish, as of the date they were respectively executed, the state of personal relations between the testator and the devisees therein named and his then intentions with reference to the disposition of his property made thereby, but also to afford strong and persuasive evidence of the substantial and uninterrupted continuance thereof in all respects until each of such instruments was formally or actually superseded or revoked.

A deed procured by the exercise of undue influence upon the grantor may be set aside upon a proper and timely application of the party aggrieved. 18 C. J. 236.

Having these principles in mind, we now come to the consideration of the controlling facts on the issue of undue influence.

Rosalia Blochowitz, the mother, accepts the provisions for her support contained in the deeds, and in effect joins in the prayer that they be sustained. To the daughters, Lena M. Yankton and Anna Geistlinger, the wills of 1903, 1907 and 1910 provide identical legacies of $100 each, and no more. The will of 1929, executed substantially contem-

poraneously with these deeds, raised these legacies to the sum of $500 each. Their friendly relations to their father in his lifetime, as well as the constant and abiding scheme for the disposition of his property adopted by him, evidenced by all the wills now before the court, so far as they were concerned, wholly negative the possibility of undue influence in any manner affecting the provisions made in their behalf by the testator. Inequality of distribution of itself raises no presumption of the exercise of undue influence. *In re Estate of Stuckey,* 105 Neb. 641; *In re Estate of Kees,* 114 Neb. 512.

Indeed, courts of high standing recognize the fact that it is to be expected, and is not unnatural, but a common practice, for men of European birth to give the greater portion of their property to sons, particularly where the daughters are married. *Fortner v. Helgeson,* 188 Wis. 594.

Nor does the charge that the deed to the eldest son was tainted with undue influence or fraud find any substantial support in the evidence. Until attaining the age of 33 years this boy had been subjected unreservedly to his father's direction and absolute control. He had labored for his father continuously, receiving practically no compensation for his toil. There is no evidence of any break in the friendly relations between this son and the father, and in the record before us there is no possible question as to the steady, fixed purpose of Joseph Blochowitz in the matter of rewarding the eldest son in the manner effected by the deed executed here in suit. Indeed, the plaintiff son admits that he was informed by the father prior to the war, but after the 640 acres had been acquired, that each of the sons would receive a quarter section of land. By the terms of each of the wills of 1903 and 1907, Frank J. Blochowitz was devised a quarter section of the Lancaster county land. In the will of 1910 he was devised the S.E.¼ of section 14, township 8, range 5, which as to him remained in full force and effect until the execution by his father and mother of the deed to him in suit. In this questioned deed he receives this land last described, no more, no less, no other.

The admitted facts of the record thus effectually negative the operation of undue influence in the conveyance to Frank J. Blochowitz.

Nor do we find any lack of evidence in the record sustaining the deed of conveyance to John A. Blochowitz, the second son, whose age is 42. He, too, according to the admitted declarations of his father, was to receive a quarter section of the 640 acres then owned by the latter. The wills of 1903, 1907 and 1910 evidence the intent of the father that John was to receive the home place. This quarter section was valued by plaintiffs' witnesses at $125 to $130 an acre. By the warranty deed in suit herein there is conveyed to John, not the home place, but the N.E.¼ of section 14, township 8, range 5, which plaintiffs' experts value at $100 an acre. The testimony of Albert J. Blochowitz, hereinafter referred to, affords a convincing reason for this change, so that this transfer also may fairly be said to be substantially in accord with the long, fixed and continued purpose of the father evidenced by his admitted oral declarations, as well as by the provisions of the wills referred to. Aside from this, the comparative value of the two tracts in no manner indicates that an undue influence was exerted by or in behalf of John A. Blochowitz to secure the substitution of the land conveyed by deed for the land devised by the wills.

The warranty deed of April 4, 1929 in suit, conveys to George Blochowitz the "home place" and also the E.½ of the N.W.¼ of section 14, township 8, range 5. This comprises 240 acres. The 80-acre tract last described was devised to George in each of the father's wills of 1903, 1907, and 1910. With reference to intentions of the father as to the disposition of the "home place," the following appears in the record: Albert Blochowitz, testifying in his own behalf on his direct examination, speaks of what he calls "a will," which was exhibited or read to his mother, his brothers, and himself at the home place by his father "twenty or more years ago," and of the contents of this instrument says: "He (Joseph Blochowitz) had the will

made and he read it that each one of the boys should have 160 and the two that get places with improvements should have $5,000 less than those who get places without improvements." "He read it to us. He had the will right there, and the girls should have $500, and the balance should be divided. * * * They should have $500 where the boys get a quarter. Q. And all the other property be divided equally among the boys? A. Yes, sir." On cross-examination this witness testified that no particular piece of land was described in the will as being devised to any one; but that it provided with reference to the home place, "Well, the one that would stay at home would get the home place." He (Joseph Blochowitz) said "either the youngest or the one who was married last would get the home place." This witness also testified that he does not remember the provisions made in behalf of the mother; but that, after the will had been read and explained by the father, it was submitted to the sons and by them approved. It is quite possible, in view of the fact that the lands devised were not described or identified in the writing referred to, that the witness was mistaken in the character of the instrument submitted to them for consideration. No such will is in the record. The provisions, as testified to by him, are such as might well be embraced in a preparatory memorandum for the making of a will, but would hardly be found in the completed instrument as it would come from the hands of a competent draftsman. But, whether a will or a memorandum preparatory to making one, it evidenced the father's adopted plan, then declared by him at a time when his competency was unquestioned, and fraud and undue influence concededly absent, that under the situation as existing at the date of the deeds the youngest son should ultimately receive the family home.

But little or no support in the evidence is to be found sustaining the theory that a serious estrangement between the father and the plaintiff son occurred, growing out of, or because of, the latter's participation in the World War.

True, the father, while the conflict was still on, tried to secure Albert's release from military service, and at one time stated that "he had lots of work to do, and most generally when they go to war they never come back." And at another time said, "The war is bad business;" and at still another time, in a conversation concerning Albert's being then in the army, remarked, "It was bad; the boys are just spending money there; they spend too much money." He thought "they should not have any wages when they get their clothes and board, that ought to be sufficient." These different statements are all that plaintiffs' evidence discloses on this subject. We find no direct evidence, however, that the subjects of these remarks were ever referred to, discussed, or considerd by Joseph Blochowitz, after the war, save and except the unsupported testimony of the plaintiff son that once after his return, when he and his father were alone together, "he told me that John and Frank had told him that I was running around in France and spending all my money."

We may not approve of the father's efforts to deprive the nation in time of war of the military service of the son. Even so, this court would certainly be wholly unjustified in penalizing the entertaining and voicing of the views expressed by the father, and his instigation of the proceedings taken in behalf of the son, by, in effect, judicially depriving this father, and those similarly situated, of testamentary capacity and of the power to make such disposition of their property, accumulated by industry and thrift, as their judgment may dictate. Indeed, without criticism of the son, it may be said that it is undisputed in the record that he did write home from France for money, in addition to his army pay.

The evidence, however, is without contradiction that a serious disagreement did occur between the father and the plaintiff son in reference to a proposal that the father would, or should, turn over to this son a quarter section of the Lancaster county land which the latter should farm and improve. While it is not expressly stated in the record,

yet the uncontradicted facts sustain the inference that the same relations between the father and the plaintiff son were implied in this proposal that existed between the family and the other sons who had been given land to farm, and there is nothing which indicates that, had it been accepted, Albert would have been differently treated. But it was not accepted. It is patent that Albert desired a quarter section which it subsequently appears was then intended by the father for another son. He (Albert) was at the time of the consideration of the proposal refused any "papers" or assurance by the father that would guarantee him continued possession of, or ultimate title to, the land involved, but was advised that his brother John had the superior right thereto. Solely due to this fact, it seems, the son spurned the offer, and thereafter wholly withdrew from the communal family and from participation in its communal affairs. He thereafter conducted his business affairs on an individualistic and wholly independent basis. The other sons remained with the father and carried out and respected his plans and directions in the family affairs. This situation had continued almost ten years at the time of the execution of the deeds in suit. There is no testimony that any of the other sons were present at, or in any way participated in, or were connected with, the basic disagreement. The entire record, we feel, unmistakably indicates that the results of which the plaintiff son complains are due, not to any malign influence exerted against him by his brothers, but to the natural and inevitable effect of a nine year abandonment of the communal family enterprise, of which the father was the directing head. He, who for almost ten years ceased to contribute to the common enterprise and wholly withdrew therefrom, in conscience foreclosed himself of the right to expect equality of consideration by the father in the distribution of the avails thereof.

Plaintiffs introduced evidence as to the existence of fiduciary relations between the defendants and their father during the continuance of which, by transactions had between them, it is claimed, the father was divested of his

ownership of a large amount of bonds, mortgages and securities, and in which the same became the property of such defendant sons. It seems to be contended that this line of testimony not only establishes the nature of the relations existing between these parties, but sustains the charge that the real estate transfers were tainted by the exercise of undue influence on the part of the transferees. The evidence in the record, however, does not support this contention. In *Holtman v. Lallman, ante,* p. 183, wherein similar issues as questions of undue influence and fraud were presented, the pleadings embracing both conveyances of real estate and gifts of personal property, this tribunal determined the law, by implication at least, against plaintiffs' present contention, by sustaining the transfers of real estate and by setting aside the gifts of personal property. In the present case we are limited by the pleadings to the validity of the warranty deeds in suit. The source of the funds involved in these investments is not a matter of dispute. It is agreed that the father, from the beginning, appropriated and controlled all of the profits and proceeds of the 640-acre farm, a situation which was continued long after the sons had attained their respective majorities. It may be fairly deduced from the evidence that the fund was contributed to by Frank, George and John as late as the month of the father's death. The hope and inducement which from the commencement of the course of business was held out by the father to his sons was that the investments made by him were for their benefit, and in due time would become their own. The evidence of the banker from whom a large amount of the securities involved were purchased is, in substance, that the business was transacted by the father at his home. Personally he never went to the bank for that purpose, even in the earlier years. The members of the family, while quite often present during the negotiations, and to an extent participating therein, were his servants and messengers in the matters transacted, and simply carried out his decisions and directions with reference to the same. Joseph Blochowitz was always

the dominant controlling spirit in these matters, and, from all the evidence, it fairly appears that there was no change in the situation up to and including the last of these transactions, which took place a few days prior to his death. So, too, the transfer to, or placing of these securities in, the names of the several sons did not commence after the estrangement of Albert, but these promises made by the father to his sons, it is quite plain, were in the course of fulfilment long prior to 1917. Relating to this subject Albert testified in part: "A. He (Joseph Blochowitz) had been buying (securities) all the years I know before the war when I was home. I used to go with mother to the First Trust Company, and take the money for fat cattle, and take the money and put it in mortgages in John's or George's name, in mortgages for John and George. * * * Q. And sometimes in your name? A. Yes, sir; sometimes in mine."

It is also quite evident that as this division between the sons was carried out, both before and after the war, it was not made upon a per capita equality basis. It was a matter that rested wholly on the judgment of the father, who did not hesitate, by the exercise of parental authority, to change the situation at any time, even after legal title to the personal property involved had been fully vested in the donees.

It is quite obvious that, notwithstanding the advancing years and the delegation of certain matters to others, Joseph Blochowitz was, and ever continued, the master mind and the occupier of the relatively dominant position, and at no time, in comparison with his sons, could he be deemed the weaker party. The situation fully justifies the application of the rule that, "Even where the donor and donee stand in confidential relations, the presumption of undue influence arises only when the weaker party is the donor, being always against the party having the superior dominant position or control, though who was the dominant spirit is always a question of fact." 8 R. C. L. 1033, sec. 89.

Expressly negativing the intention to determine the validity of any of the transfers of personal property set forth in plaintiff's evidence, as between the respective parties thereto, we are still of the abiding opinion that, under all the circumstances disclosed by the record, they wholly fail to establish the exercise of undue influence over the father in the real estate transactions in suit.

Undue influence, whatever the technical definition thereof may be, must amount in effects accomplished to the destruction of the free agency of the grantor, and there must be proof that the deed was obtained thereby, and it must be shown that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which cannot be presumed, but must be proved, in connection with the conveyance in suit, and not with other things. *Latham v. Schall,* 25 Neb. 535; *Seebrock v. Fedawa,* 30 Neb., 424, 438; *Boggs v. Boggs,* 62 Neb. 274, 284; *Ward v. Ward,* 86 Neb. 744, 748; *In re Estate of Dovey,* 101 Neb. 11, 18; *Stull v. Stull,* 1 Neb. (Unof.) 389, 392.

It follows, therefore, that the validity of the warranty deeds in suit is fully sustained by the evidence, and the trial court erred in adjudging them void.

The judgment of the district court is, therefore, reversed and the cause remanded, with directions to enter judgment in favor of defendants and against plaintiffs in conformity with this opinion, thereby confirming the several deeds in suit and quieting the several titles vested thereby; provided, however, that the district court is authorized to permit an amendment to the pleadings by the plaintiff Albert J. Blochowitz, if so advised, setting forth the alleged alterations of the warranty deed of April 4, 1929, in which he is named as grantee, to the end that issues thereon may be formed and such matter determined.

REVERSED.